IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| ZEIKOS INC., | ) |
| Plaintiff, | ) |
| v. | ) No. 23 C 303 |
| WALGREEN CO., | ) Judge Virginia M. Kendall |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Zeikos Inc. ("Zeikos"), an importer and seller of electronic accessories, entered into a contract with Walgreen Co. ("Walgreens") to sell products in "premium space" at Walgreens's stores. Zeikos estimated that the deal would generate about $112 million in revenue. But that estimate missed the mark. Zeikos was selling far below its projections, allegedly because Walgreens had breached the original and two subsequent contracts. As a result, it sued Walgreens for fraudulent inducement and breach of contract. Walgreens moves to dismiss. (Dkt. 93). For the following reasons, the motion is granted. (*Id.*)

## BACKGROUND

Zeikos engages in the business of "importing, and selling to retailers located throughout the United States, products including electronic accessories, such as earphones, battery chargers and speakers." (Dkt. 88 ¶ 4). In 2011, Zeikos began selling electronic accessories to Walgreens, one of the largest retail pharmacy chains. (*Id.* ¶¶ 5–6).

On May 14, 2019, Jack Saideh and James Trappani—Zeikos's president and vice president respectively—met with Albert Gehrke, Walgreens's buyer for electronic accessories. (*Id.* ¶¶ 4, 9).

1

Gehrke explained that Walgreens would be offering a new business opportunity that might interest Zeikos. (*Id.* ¶ 10). Vendors could bid on the right to sell merchandise in a four-shelf fixture in "certainly highly desirable sections of Walgreen[s'] stores, designed the '010' Space and the Saddle Fixtures (collectively, the 'Premium Space')." (*Id.*) The "010" Space was adjacent to the cash registers, so that customers pass by the items as they check out. (*Id.*) Saddle Fixtures, clear plastic shelves, were then placed over the existing fixture near the registers to give products more prominence. (*Id.*) The resulting "Premium Space was among the most valuable, if not the most valuable, location in Walgreen[s'] stores." (*Id.*) Gehrke represented that in the prior year, Walgreens assigned the Premium Space to a private label vendor and, the year before, to a vendor named "Tech&Go." (*Id.* ¶ 11). He claimed that Walgreens sold between $80 to $100 million of private label merchandise the previous year and, the year before, $250 million of Tech&Go's merchandise. (*Id.* ¶ 12).

Zeikos was interested in the business prospect. (*Id.* ¶ 14). It offered Walgreens an upfront credit of $10 million for the exclusive right to sell products for one year in the Premium Space. (*Id.*) Trappani provided a spreadsheet with the retail prices, and he estimated that Walgreens could realistically sell about $112 million worth of Zeikos's products. (*Id.* ¶ 16). After a series of negotiations, Zeikos lowered its offer to $9 million, and Walgreens accepted the exclusive-product deal. (*Id.* ¶ 28). Zeikos and Walgreens then executed the Product Placement Agreement ("PPA"). (*Id.* ¶¶ 30, 33). Paragraph 5 specified,

> The term of this Agreement shall commence on the Effective Date and continue for one (1) year (the 'Initial Term'). The placement space on the Fixtures shall be re-bid to various vendors after one year if the Merchandise does not achieve One Hundred Million and No/100 Dollars ($100,000,000) in Net Sales during the Initial Term.

(*Id.* ¶ 32). Walgreens then ordered $8 million in Zeikos merchandise and took a $5 million credit. (*Id.* ¶ 34).

Zeikos "suspected that something was wrong when Walgreen's initial projections of purchases of Merchandise for the Premium Space … demonstrated that Zeikos had little chance of selling $100,000,000 in Merchandise from the Premium Space." (*Id.* ¶ 35). The company questioned a possible discrepancy between the orders Walgreens placed and the ability to reach its sales goal. (*Id.* ¶ 36). Walgreens responded that the projections would change once the products appeared in the premium space of more stores. (*Id.* ¶ 35).

On April 1, 2020, the parties agreed to an Amended and Restated Product Placement Agreement ("Amended PPA") for the remainder of the year, replacing the previous PPA. (*Id.* ¶ 57). From the execution of the first PPA through the end of the Amended PPA, a little over a year, Zeikos's sales never exceeded $20 million. (*Id.* ¶ 59). The company attributes this shortcoming to alleged breaches by Walgreens. Specifically, Walgreens never placed Zeikos's merchandise in the required 5,000 stores. (*Id.* ¶¶ 61–62). In some of the stores, Walgreens failed to place the merchandise in the premium space or "similar placement." (*Id.* ¶ 66). Nor did it (1) abide by the display obligations to use fixtures that fit the packaging of the merchandise, leaving empty spaces as necessary; (2) place mylar labels for each item of merchandise next to that item, and (3) keep the Saddle Fixtures free from obstruction from other fixtures and products. (*Id.* ¶ 67). And despite ordering $20 million worth of goods, Walgreens only paid $11.85 million, with credits of $7.5 million. (*Id.* ¶ 70).

Notwithstanding the alleged breaches, Zeikos and Walgreens exchanged terms for a proposed agreement spanning the following year, 2021 (the "Renewal"). (*Id.* ¶ 74). Zeikos sent an attached document in an email memorializing the agreed-upon terms: its merchandise would

remain in the premium space, and Zeikos "would provide Walgreen[s] with some price concessions." (*Id.*) Instead of a fixed payment, the parties agreed to a 20 percent product discount. (*Id.* ¶ 75). The performance period lasted from January 21, 2021, through December 31, 2021. (Dkt. 88-3 at 1). Gehrke responded by signing the attached document with the note that a "more formal agreement will follow." (Dkt. 88 ¶ 80). Walgreens did send a formal agreement on April 8, 2021. (*Id.* ¶ 83). It provided that "this Agreement shall commence on January 1, 2021 and continue for one (1) year (the 'Term'). The Term will automatically renew for additional one (1) year periods unless one Party provides the other party at least sixty (60) days' prior written notice of its intention to terminate this Agreement at the end of the then-current Term." (*Id.*)

On August 27, 2021, Walgreens terminated the Renewal with sixty days' notice. (*Id.* ¶ 85). During the period that the agreement was in effect, Walgreens allegedly repeated many of its prior breaches: failing to place the products in the agreed-upon number of stores, failing to present the merchandise appropriately, and failing to pay for goods sold and delivered. (*Id.* ¶¶ 87–95). On the latter issue, Zeikos elaborates that it delivered $8.8 million worth of merchandise but paid $5.285 million with $3.52 million in authorized credits. (*Id.* ¶ 93).

Zeikos originally filed suit against Walgreens in the District of New Jersey.[1] (Dkt. 1). Zeikos then filed an amended complaint before the same court. (Dkt. 24). Walgreens moved to transfer to the Northern District of Illinois, which was granted. (Dkt. 66). The first district-court judge declined to decide any other dispositive motions, deferring to the transferee court. (Dkt. 67). Zeikos then amended its complaint once more. (Dkt. 88). The Second Amended Complaint brings claims for fraud in the inducement for the original PPA (Count I), negligent misrepresentation in

---

[1] Zeikos is headquartered and organized under the laws of New Jersey; Walgreens is an Illinois corporation, headquartered in Illinois. This Court has jurisdiction under 28 U.S.C. § 1332 because the parties are diverse, and amount-in-controversy exceeds $75,000.

the inducement for the original PPA (Count II), breach of contract for the Amended PPA (Count III), breach of contract for the Renewal (Count IV), and a breach of contract for failure to pay for all goods sold and delivered (Count V). (*Id.*). Walgreens moves to dismiss for failure to state a claim. (Dkt. 93). Zeikos concedes that it did not state a plausible claim for relief as to Count II but contends the remaining counts pass muster. The Court accepts this concession and considers the other counts in turn.

## **LEGAL STANDARD**

Under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (cleaned up). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014)).

## DISCUSSION

### I. Fraud in the Inducement (Count I)

"Fraudulent inducement is a form of common-law fraud." *Avon Hardware Co. v. Ace Hardware Corp.*, 998 N.E.2d 1281, 1287 (Ill. App. Ct. 2013) (quoting *Lagen v. Balcor Co.*, 653 N.E.2d 968, 972 (Ill. App. Ct. 1995)). Common-law fraud has five elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent to induce plaintiff's reliance on the statement; (4) plaintiff's reasonable reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Merrilees v. Merrilees*, 998 N.E.2d 147, 158 (Ill. App. Ct. 2013). Federal Rule of Civil Procedure 9(b) imposes an additional requirement. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This burden requires "the plaintiff to describe the who, what, when, where, and how of the fraud." *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021) (cleaned up) (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)).

Zeikos's complaint suffers from two threshold problems. First, Zeikos filed a redacted version of the Second Amended Complaint. (Dkt. 88; *see also* Dkt. 95). This decision creates an obvious problem: the Court has no way to assess blacked-out information. And most of the missing allegation relate to Count I, fraudulent inducement. Specifically, half of paragraphs twelve and thirty-nine, paragraphs seventeen through twenty-seven, paragraph forty-five, and paragraph forty-six—fourteen paragraphs in total—are missing. Local Rule 5.7 permits a plaintiff to file a case under seal. But Zeikos never used this mechanism or even explained the absence of a significant number of facts.

Second, Zeikos alleged several facts based on "information and belief." "When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are 'based on secondhand information that [he] believes to be true.'" *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (quoting *Black's Law Dictionary* 783 (7th ed. 1999)). Under the plausibility standard, allegations on "information and belief" are viewed somewhat skeptically (described more below). For fraud claims, they have almost no place. "[A]lleging fraud 'on information and belief' is normally insufficient to satisfy Rule 9(b)'s heightened pleading standard." *Mamalakis*, 20 F.4th at 301. Zeikos has failed to articulate why its facts are sufficient. As such, its allegations based "information and belief" cannot be used to support its fraudulent-inducement claim.

Stripped of both redacted and information-and-belief facts, there isn't much left. Zeikos has not explained *with particularity* how Walgreens fraudulently induced the company. It alleges that Walgreens convinced the company to sign the original PPA based on false sales data from the previous two years. (Dkt. 88 ¶¶ 38–41). But this conclusory statement offers little context, much less the "who, what, when, where, and how of the fraud." *Mamalakis*, 20 F.4th at 301. Two points bear particular emphasis. Zeikos does not provide any support for the conclusion either that these figures were false or that Walgreens knew these figures were false. *See Merrilees*, 998 N.E.2d at 158. The pivotal paragraph states only that "[u]pon information and belief, Walgreen's actual retail sales of private label merchandise from the Premium Space in the prior year were"—and the rest is redacted. (*Id.* ¶ 39). This unilluminating allegation simply does not suffice. Zeikos may have sold fewer goods than the projected $100 million. Several reasons could explain that, however. (For example, Zeikos may have inferior goods.) Moreover, while the company emphasizes that it

7

"questioned … the discrepancy," it still signed an Amended PPA, then a Renewal the following year. (*Id.* ¶ 36). The decision to sign more agreements with a company that allegedly committed fraud undermines the argument altogether. Rule 9(b) demands "precision and some measure of substantiation." *Mamalakis*, 20 F.4th at 301. Both are lacking here.

## II. Breach of Contract (Counts III – V)

Parties must abide by the terms of a contract. *See In re Illinois Bell Telephone Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. Ct. 2013). Zeikos alleges a breach of the Amended PPA (Count III) and the Renewal (Count IV); along with the claim that Walgreens still owes Zeikos money for unpaid goods (Count V). Each falls flat.

Zeikos again pleads allegations based on "information and belief." Unlike fraud claims though, Rule 9(b)'s particularity requirement does not govern; a claim need only be "plausible on its face." *Twombly*, 550 U.S. at 570. The different standard means a less demanding approach. "[F]actual allegations [pleaded] on information and belief" are accepted if "the facts are peculiarly within the possession and control of the defendant" or "the belief is based on factual information that makes the inference of culpability plausible." *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023) (quoting *Arista Recs. LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *see also Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012); *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *cf. Pirelli Armstrong*, 631 F.3d at 442–43. Ultimately, the more forgiving standard means little. Zeikos has not established why any of the complaint's information-and-belief facts arise from evidence within the exclusive control of Walgreens or that its beliefs "makes the inference of culpability plausible." *Ahern Rentals*, 59 F.4th at 954 (quoting *Arista Recs.*, 604 F.3d at 120).

Start with the Amended PPA. Zeikos alleges that Walgreens violated three terms of their contract by failing to place Zeikos's merchandise in the agreed-upon number of stores, failing to place the merchandise in the coveted premium space, and failing to properly present the merchandise. (Dkt. 88 ¶¶ 61–68). The problem lies with the fact that all three of these allegations are based upon "information and belief." (*Id.* ¶¶ 64, 66, 68). Walgreens does not have exclusive control over the information underlying these allegations. Zeikos should know—and be able to provide some evidence (photos, videos, invoices, attestations, etc.)—for each assertion. Presumably, a company would engage in fact-checking to ensure a party is adhering to terms of a $100 million contract. Zeikos is a sophisticated entity with resources and advanced capabilities. It could gather support for each allegation. It chose not to.

That leaves the company with only the second way of substantiating its information-and-belief allegations—the facts "make[] the inference of culpability possible." *Ahern Rentals*, 59 F.4th at 954 (quoting *Arista Recs.*, 604 F.3d at 120). But the complaint is largely conclusory. Paragraph sixty-four states that "Walgreen failed to meet its obligation … to place each item … in 5,000 stores." (Dkt. 88 ¶ 64). Paragraph sixty-six adds the merchandise was not placed "in the Premium Space or … 'similar placement.'" (*Id.* ¶ 66). And paragraph sixty-eight states that Walgreens "failed to meet its obligation to present the Merchandise in all of the stores in a commercially reasonable manner." (*Id.* ¶ 68). No other facts support these conclusions, which independently makes the "inference of culpability" difficult to draw. But there is more. The history between the parties again undercuts any plausibility. Zeikos willingly renewed its contract with Walgreens even after these alleged breaches—while offering a considerable incentive, a 20 percent discount. (*Id.* ¶ 77). While it is possible that two entities might continue to contract with one another and leave possible breaches to the courts, more explanation would be required to make

that scenario believable. That is certainly true when a party attempts to submit factual allegations based on "information and belief."

Zeikos makes an identical mistake in arguing that Walgreens breached the Renewal. The allegations mirror each other: "Upon information and belief, Walgreen[s] failed to meet its obligation under the January 2021 Contract to place Zeikos's Merchandise in 5,000 stores," (*id.* ¶ 89), and "Upon information and belief, Walgreen[s] failed to meet its obligation to present the Merchandise in a commercially reasonable manner," (*id.* ¶ 91). Again, because Zeikos's submissions are neither under the control of Walgreens nor plausible, they cannot be accepted. Without them, only legal conclusions remain. Those submissions are insufficient to state a plausible claim of relief.

As for the "unpaid goods," the Second Amended Complaint itself suggests that Walgreens owes nothing to Zeikos. It states, Walgreens placed orders, and Zeikos delivered merchandise, totaling $6.575 million; Walgreens paid Zeikos $3.95 million and took $2.5 million in authorized credits. (Dkt. 88 ¶¶ 98–99). But only six paragraphs above, the allegation reads, "Walgreen[s] paid Zeikos about $5,285,000, and took authorized credits of $3,520,000." (*Id.* ¶ 93). These latter numbers suggest that Walgreens overpaid. At a minimum, the complaint contradicts itself, lacking clarity as to what exactly Walgreens purchased and paid. Zeikos concedes "the language could be clearer" yet still asks the Court to engage in mathematical gymnastics, adding together unclear statements in various parts of the complaint to arrive at a figure of $777,000. (Dkt. 95 at 15). That request misunderstands the role of judges, who are not arithmeticians rummaging around a factual morass to save a poorly worded complaint. Zeikos will have a chance to straighten out the "could be clearer" language. For now, though, its claim does not survive.

10

**CONCLUSION**

For these reasons, the motion to dismiss is granted. (Dkt. 93). Plaintiffs are generally afforded the chance to amend their complaints. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). It is not "*certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Saint Anthony Hosp. v. Eagleson*, 40 F.4th 492, 517 (7th Cir. 2022) (quoting *Runnion*, 786 F.3d at 519). Thus, the dismissal shall be without prejudice to the filing of an amended complaint or complaints no later than June 30, 2023. If no complaint is filed by that date, the dismissal shall convert to one with prejudice.

Virginia M. Kendall
United States District Judge

Date: June 12, 2023