**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ZEIKOS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23 C 303 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| WALGREEN CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## <u>REDACTED MEMORANDUM OPINION AND ORDER</u>

The Court previously dismissed Zeikos Inc.'s Second Amended Complaint because it failed to plead sufficient facts to support its claims. (Dkt. 99). Now, aided by months of discovery, Zeikos filed a Third Amended Complaint ("Complaint"), (Dkt. 105), to remedy its past factual inadequacies. The Complaint alleges a fraudulent inducement claim and several breach-of-contract claims against Walgreen Co. On July 17, 2023, Walgreen filed a motion to dismiss [110], stating that Zeikos has still failed to address the structural deficiencies in its claims. For the following reasons, the Court grants in part and denies in part Walgreen's motion to dismiss.

## <u>BACKGROUND</u>

Zeikos Inc. imports and sells electronic accessories, like earphones, battery chargers, and speakers, to U.S. retailers, like Walgreen Co. (Dkt. 104 ¶ 7). Jack Saideh and James Trappani serve as President and Vice President of Zeikos, respectively, and the company has a longstanding business relationship with Walgreen. (*Id.* at ¶¶ 2, 7, 9). On February 21, 2019, the Divisional Merchandise Manager for Walgreen, Amanda Corbett, informed Zeikos senior officers that Albert

Gehrke would serve as the new Buyer for the Walgreen's Electronics Category, which included Zeikos products. (*Id.* at ¶ 11).

While a Walgreen store sells electronics in various aisles, it has "historically dedicated certain high traffic spaces near the cash registers to the Electronic Category," or "Premium Space." (*Id.* at ¶ 12). Premium Space consists of either a 010 Fixture, a four-shelf stand, or a Saddle Fixture, a series of plastic compartments affixed on existing stands. (*Id.*) According to Zeikos, the Premium Space is a coveted and valuable display location for products within a Walgreen store. (*Id.*) Walgreen had previously used the Premium Space to sell electronic accessories under its own private "Infinitive" label. (*Id.* at ¶ 13).

Despite its proximity to high traffic spaces, products in the Premium Space had experienced a downward trend in sales between 2015 to 2018. (*Id.* at ¶ 15). ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████ Enter Zeikos.

## I. Product Placement Agreement

On May 14, 2019, Gehrke told Zeikos of a new business arrangement where "suppliers could bid on the right to pay Walgreen" a fixed payment "to exclusively sell the supplier's product in the Premium Space." (*Id.* at ¶ 25). During this meeting, Gehrke orally told Saideh and Trappani that in the prior year, Walgreen assigned the Premium Space to its Infinitive brand and before that, to another supplier, Tech&Go. (*Id.* at ¶ 26). At the same meeting, Gehrke "orally represented to Saideh and Trappani that Walgreen had sold between $80 million and $100 million of 'Infinitive' brand products in the prior year from the Premium Space…and, prior to that…had sold at least

$250 million a year of 'Tech&Go' products from the Premium Space." (*Id.* at ¶ 27). According to Zeikos, that representation was false: ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

       In its Complaint, Zeikos repeatedly focuses on the importance of this $100 million sales representation. On or about August 27, 2019, Gehrke provided a draft contract stating that Zeikos has a "right to renew the contract for a second year if the retail sales from the first year of the contract exceeded $100 million." (*Id.* at ¶ 59). To emphasize the connection between the product placement in the Premium Space and the $100 million sales, Zeikos proposed additional language stating if the 010 and Saddle Fixtures were moved to areas with less customer traffic, then the $100 million sales would be adjusted downward. (*Id.* at ¶ 60). Furthermore, on three separate occasions, Trappani mentioned to Gehrke that the business arrangement could yield $100 million sales of Zeikos products, with projections going as north as $112 million based on Zeikos's proposed retail prices. (*Id.* at ¶¶ 31–33, 53). ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ But during these conversations between Zeikos and Walgreen, Gehrke never changed or retracted the initial representation. (*Id.* at ¶ 34). Furthermore, Zeikos repeatedly requested forecasts of Walgreen's purchase orders for Zeikos products in the 10 weeks leading to the contract signing. (*Id.* at ¶ 55). But Walgreen ignored these requests. (*Id.* at ¶ 56).

On October 7, 2019, the parties executed the Product Placement Agreement ("PPA"). (*Id.* at ¶ 63). Under the PPA, Walgreen would (1) purchase 26 Zeikos products, (2) place all 26 products on the 010 Fixture in 3,000 stores, and (3) place 22 of 26 products on the Saddle Fixture in 2,000 stores. (*Id.* at ¶ 64, Dkt. 104-1). In return, Zeikos would provide $9 million in credits against Walgreen's purchases of Zeikos products, with the first installment of $5 million credits due on October 31, 2019. (Dkt. 104 ¶¶ 64, 66; Dkt. 104-1).

After the PPA was signed, on October 18, 2019, Gehrke supplied Zeikos with Walgreen's purchase forecasts. (*Id.* at ¶ 68). ██████████████████████████████████████ ██████████████████████████████████████████████████████ The forecasts showed the first monthly purchases of $1.56 million in Zeikos products for the Premium Space. (*Id.* at ¶ 71). Projected across twelve months, Walgreen would only purchase approximately $18.8 million of products, well short of meeting the $100 million retail sales figure. (*Id.* at ¶ 72). On October 28, 2019, Trappani emailed Walgreen to express his concern about the forecasts. (*Id.* at ¶ 73). Walgreen responded that the forecasts showed only preliminary numbers and as Walgreen received actual sales from additional stores, the forecasts would update. (*Id.* at ¶ 74).

Unbeknownst to Zeikos, the problems continued. As Zeikos learned through discovery,

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████ In November 2019, Zeikos employees visited a Walgreen store and photographed under-stocked fixtures. (*Id.* at ¶ 84). When Zeikos raised these photographs to

Gehrke, he replied that the specific store was removing its 010 Fixture and the issue was not widespread. (*Id.*)

On February 5, 2020, Saideh and Trappani questioned Gehrke regarding the discrepancy between Walgreen's orders of Zeikos products and the $100 million goal. (*Id.* at ¶ 86). Accordingly, Saideh and Trappani requested to delay the next installment of the payment. (*Id.*) Gehrke rejected the request and said if Zeikos was so concerned about the product placement, then Zeikos should retain a contractor to survey Walgreen stores. (*Id.* at ¶ 87). Zeikos declined to do so because a survey would have been costly and non-binding on Walgreen. (*Id.* at ¶ 88). On February 6, 2020, Trappani followed up by requesting Walgreen's prior sales of "Infinitive" brand products, but Walgreen did not provide the information. (*Id.* at ¶ 89). ███████████████████ ████████████████████████████████████████████ ████████████████████████████████ On February 12, 2020, Saideh and Trappani again questioned Gehrke about Walgreen's sales from the Premium Space in the prior year. (*Id.* at ¶ 94). Gehrke declined to provide a specific number and instead stated that Walgreen was "doing roughly half of that [$150 million] currently. If you took that as that we did $80 million, fine that's your interpretation of that…I told you that that Infinitive program at one point had done over 150 million dollars. I said that we have not done that in recent years." (*Id.*)

On February 21, 2020, Saideh wrote to Walgreen to terminate the PPA and cease payment of the remaining $4 million owed. (*Id.* at ¶ 98). In the letter, Saideh recapped Gehrke's oral representation that Walgreen had sold $80–100 million in Infinitive products in the prior year and, relying on that representation, the parties agreed to the $100 million retail sales goal in the PPA. (*Id.*) In a reply, Corbett rejected Saideh's recollection, stating that Gehrke never made that

representation to Zeikos and the parties never mutually agreed upon any ties between the PPA and a $100 million retail sales goal. (*Id.* at ¶ 99).

## II.     Amended Product Placement Agreement

Despite the parties' disagreements, conversations between Walgreen and Zeikos continued. On March 2, 2020, Zeikos offered the remaining $4 million to Walgreen if Walgreen agreed to extend the PPA for another year. (*Id.* at ¶ 105). Walgreen rejected the proposal and held Zeikos to its earlier decision to terminate the PPA. (*Id.* at ¶ 106). Furthermore, Walgreen expected Zeikos to pay Walgreen's expenses to the tune of $1,812,000 for inventory write offs, fixture expense purchases, and return of merchandise, plus a full refund on all the unsold products. (*Id.*) In total, Zeikos alleges that Walgreen's expense payment would lead Zeikos to financial ruin, especially since Walgreen could unilaterally deduct these amounts from the accounts payable. (*Id.* at ¶ 107). Alternatively, Corbett offered to revise the PPA by reducing the amount owed from $4 million to $2 million with payments spread across the remaining calendar year. (*Id.* at ¶¶ 108, 112). Zeikos alleges that it took the lesser of two evils and agreed to the Amended PPA on April 20, 2020. (*Id.* at ¶ 115).

Like the PPA, the Amended PPA required Walgreen to place Zeikos products in:

(a) Three Thousand (3,000) stores on a "010 fixture," which is a four (4) shelf fixture located at the front of the store that sits at the beginning of the registers; and (b) Two Thousand (2,000) stores, on a "saddle fixture," which is an acrylic tray that sits on the half shelf in the checkout queue.
If Walgreen changes the Fixtures or moves such Fixtures to other areas in the stores, Walgreens shall use its best efforts to provide Vendor similar placement during the remainder of the then-current Term with similar amount of customer traffic as the 010 fixture and/or saddle fixture, as applicable

(Dkt. 104-3). The Amended PPA also "superseded in its entirety" the PPA. (*Id.*)

Critically, before entering the Amended PPA, Zeikos alleges that it did not know about any fraud. (Dkt. 104 ¶ 114). ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

During the Amended PPA's performance period, Zeikos alleges that ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

## III.     January 2021 Contract

After the Amended PPA ended, Zeikos and Walgreen signed another agreement for the 2021 year ("January 2021 Contract") with the performance period from January 21, 2021 to December 31, 2021. (*Id.* at ¶¶ 129, 131, 133). Notably absent from the January 2021 Contract was any language concerning the procedure to terminate the contract. (*Id.* at ¶ 135). The parties attempted to memorialize a formal agreement with the following termination rights:

> **Term, Termination**. The term of this Agreement shall commence on January 1, 2021 and continue for one (1) year (the 'Term'). The Term will automatically renew for additional one (1) year periods unless one Party provides the other party at least sixty (60) days' prior written notice of its intention to terminate this Agreement at the end of the then-current Term. Either party may terminate the Agreement for any or no reason by giving at least sixty (60) days' written notice of termination to the other party. Either party may terminate this Agreement upon fifteen (15) days' written notice if the other party fails to cure a breach of this Agreement for which the non-breaching party provided notice thereof and thirty (30) days to cure."

(*Id.* at ¶ 137). But the parties never executed the draft agreement. (*Id.* at ¶ 140).

As Zeikos learned through discovery, during the January 2021 Contract, ███████████

████████████████████████████████████████████████████████████

██████████████████████████████████

On August 27, 2021, Gehrke provided 60 days' notice that Walgreen would terminate the exclusive relationship with Zeikos involving the Premium Space and no longer purchase any products associated with the fixture business arrangement. (*Id.* at ¶ 148).

## IV.     Failure to Pay for Goods Solid and Delivered

Since October 2019, Walgreen would send Zeikos a purchase order for electronic accessories, and Zeikos would send both Premium Space and Non-Premium Space products and an invoice to Walgreen. (*Id.* at ¶¶ 150, 238). As ordinary business practice, Walgreen would have opportunities to deduct credits from the invoice. (*Id.* at ¶ 151). For example, Walgreen would receive a 2% cash discount if it paid its invoice within 45 days. (*Id.*) But Zeikos alleges that Walgreen inappropriately took additional credits off invoices without justification. (*Id.*) Walgreen allegedly deducted credits for (1) claimed shortages of products in Zeikos's shipments; (2) defective products, in violation of the January 2021 Contract; (3) more defective products than what Walgreen returned to Zeikos; and (4) no justification provided. (*Id.* at ¶¶ 153–56).

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). When considering

a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (cleaned up). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014)).

Allegations of fraud are subject to Rule 9(b)'s heightened pleading standard. *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005). Under Rule 9(b), a plaintiff alleging fraud "'must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting Fed. R. Civ. P. 9(b)). In practice, the plaintiff must describe the "who, what, when, where, and how" of the fraud. *Id.* (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). "The Seventh Circuit has shied away from a rigid, formulaic approach to Rule 9(b) and noted that '[t]he twin demands of detail and flexibility, though in tension with one another, make sense in light of the competing purposes of the federal rules.'" *See Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011)).

## DISCUSSION

### I.   Fraud in the Inducement (Count I)

Under Count I, Zeikos claims that Walgreen fraudulently induced Zeikos to enter the PPA by providing false financial information. But before discussing the elements of fraudulent inducement, the Court first dispenses with Walgreen's novation affirmative defense. Walgreen

argues that even if it fraudulently induced Zeikos to sign the PPA, the claim still fails because of novation. Novation occurs when there is "(1) a previous, valid obligation; (2) a subsequent agreement of all the parties to the new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract." *Greenbaum & Browne, Ltd. v. Braun*, 410 N.E.2d 303, 307 (Ill. App. Ct. 1980). Walgreen's position is with novation, a valid subsequent contract supersedes the prior contract and extinguishes any fraud claims associated with the prior contract. Here, Walgreen states that the parties signed the PPA, it was terminated, the parties then entered the Amended PPA, and the subsequent agreement was valid and superseded the PPA. Thus, novation succeeded and Zeikos forewent any fraud claim associated with the PPA.

Walgreen's novation defense is premised on the plaintiff having had prior knowledge of the fraud or deception and signing the second contract despite that knowledge. *See Ainsworth Corp. v. Cenco Inc.*, 437 N.E.2d 817, 821 (Ill. App. Ct. 1982) ("It is true that one may waive a defense of fraud by entering a new contract; however, knowledge of the fraud at the time of signing the [second contract] is a prerequisite to such waiver."). But taking the Complaint as true, Zeikos never learned about any fraud until well after the Amended PPA was signed. (*See* Dkt. 104 ¶ 114). Zeikos cannot waive something that it did not know existed. And Walgreen agrees—its motion to dismiss cites several cases supporting that proposition. *See Zaremski v. Am. Arb. Ass'n, Inc.*, 2012 WL 1623207, at *4 (N.D. Ill. May 9, 2012) ("[A] party seeking to rescind a contract on the ground of fraud or misrepresentation must elect to do so promptly *after learning of the fraud or misrepresentation*.") (citation omitted) (emphasis added); *Boatmen's Bank of Benton v. Durham*, 561 N.E.2d 206, 211 (Ill. App. Ct. 1990) ("Waiver will apply if a party, *after discovering the alleged fraud and with full knowledge of its material aspects*, engages in conduct which is inconsistent with an intention to sue.") (emphasis added); *see also Mitsubishi Aircraft Int'l, Inc. v.*

10

*Brady*, 780 F.2d 1199, 1201 (5th Cir. 1986) ("If a party claims fraud in the inducement of one contract, *but then with knowledge of the fraud*, enters into a new contract on the same transaction, his claim of fraud in the inducement of the original contract appears frivolous.") (emphasis added); *Oakland Raiders v. Oakland-Alameda Cnty. Coliseum, Inc.*, 51 Cal. Rptr. 3d 144, 151 (Cal. Ct. App. 2006) ("The core holding of *Schmidt /Bagdasarian* is that one who, *after discovery of an alleged fraud*, ratifies the original contract by entering into a new agreement granting him substantial benefits with respect to the same subject matter, is deemed to have waived his right to claim damages for fraudulent inducement.") (emphasis added).

This sticking point is a factual question. Walgreen can dispute Zeikos's alleged lack of knowledge in the fraud when it signed the Amended PPA, but the motion to dismiss stage is neither the time nor place to resolve this inquiry. *See Cushing v. City of Chi.*, 3 F.3d 1156, 1163 (7th Cir.1993) (holding that resolving issues of fact are "inappropriate for resolution in a motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6)"). As such, the Court rejects Walgreen's novation argument.

But the inquiry does not end there. Zeikos still needs to plead with sufficient particularity a plausible fraud claim. "Fraudulent inducement is a form of common-law fraud." *Avon Hardware Co. v. Ace Hardware Corp.*, 998 N.E.2d 1281, 1287 (Ill. App. Ct. 2013) (quoting *Lagen v. Balcor Co.*, 653 N.E.2d 968, 972 (Ill. App. Ct. 1995)). Common-law fraud has five elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent to induce plaintiff's reliance on the statement; (4) plaintiff's reasonable reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Merrilees v. Merrilees*, 998 N.E.2d 147, 158 (Ill. App. Ct. 2013). Walgreen does not dispute the

first three elements; instead, it argues that Zeikos failed to allege sufficiently particular facts to show reasonable reliance and damages.

Zeikos has adequately pleaded particular facts to support the first three elements and the Court will quickly go through each. According to Zeikos, on May 14, 2019, at Walgreen's corporate office, Gehrke falsely represented to Zeikos that Walgreen had previously sold $80–100 million in retail sales of products displayed in the Premium Space when the actual figure was significantly less, ▬▬▬▬▬▬▬. Second, Gehrke allegedly knew the figure was ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ And common sense would dictate that the Buyer for Electronics Category at Walgreen would have access to the true sales figure. Lastly, the allegations suggest that Gehrke did intend to use the $100 million figure to induce Zeikos to enter the contract. Zeikos alleges ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬. Gehrke allegedly used the $80–100 million figure to entice Zeikos to enter the PPA and agree to an immediate $5 million payment ▬▬▬▬▬▬. In negotiations leading to the signing, Zeikos repeatedly referenced and based its projections and retail prices on the $100 million figure and offered numerous windows for Gehrke to correct himself. But allegedly, Gehrke never did.

Now, the fourth element—the Court finds sufficient and particular facts that showed reasonable reliance. Zeikos allegedly relied on Gehrke's representation that in the prior year, Walgreen sold $80–100 million of electronic accessories that were displayed in the Premium Space. While merely stating reliance does not satisfy the pleading requirements under Rule 9(b), Zeikos's other factual allegations nudge its reliance theory over the line. In negotiations prior to

12

signing the PPA, Zeikos mentioned the $100 million sales on several occasions. Zeikos used the $100 million figure to prepare revenue projections and craft a product list with proposed retail prices to achieve that goal. Zeikos alleges that the parties relied upon the $100 million representation as it based the parties' renewal of the PPA upon reaching that target. Thus, the Court can reasonably infer that Zeikos repeatedly and consistently emphasized the $100 million figure in its decision-making process because it believed Gehrke's representation that Walgreen *had achieved* this result. *See, e.g., Druckzentrum Harry Jung GmbH & Co. KG v. Motorola, Inc.*, 2010 WL 2680116, at *8 (N.D. Ill. June 30, 2010) ("The fact that the forecasts are contractually nonbinding does not mean that Druckzentrum could not have relied on Motorola's false statements to enter the contract in the first place.").

Walgreen attempts to rebut the Court's conclusion by arguing that statements of past performance cannot be reasonably relied upon for what will happen in the future. *Avon Hardware Co.*, 998 N.E.2d at 1289. Walgreen further argues there could be no reasonable reliance on the $100 million figure because Zeikos still entered the Amended PPA after learning about the actual sales of its products. *See, e.g.*, *Reger Development, LLC v. National City Bank*. 2009 WL 1233898 (N.D. Ill. Apr. 28, 2009). Both arguments are unpersuasive.

Walgreen oversimplifies the reliance principle stated in *Avon Hardware*. From the outset, *Avon Hardware* does not hold that past performance can never be reasonably relied upon and the Court has not found a case to espouse such an absolute statement. *See, e.g., Petrakopoulou v. DHR Int'l, Inc.*, 626 F. Supp. 2d 866, 868, 8701–72 (N.D. Ill. 2009) (finding plausible fraudulent inducement claim where plaintiff misrepresented how much revenue she generated in the past). Rather, *Avon Hardware* advocates that "statements must be analyzed in context" to determine reliance. 998 N.E.3d at 1289. There, the court found no fraudulent inducement because the

13

pertinent documents contained disclaimers that the information was incomplete and unreliable, thus cautioning against reasonable reliance. *Id.* Such discretion, however, cannot be said for Walgreen. Taking Zeikos's assertions as true, Gehrke did provide false information and did not provide any caveats.

*Reger Development* is also distinguishable. The Court dismissed the fraud claim because the plaintiff failed to identify a false statement. *Reger Dev., LLC*, 2009 WL 1233898, at *4. But assuming he did, the Court still found that the plaintiff did not plead particular and sufficient facts to support reasonable reliance. *Id.* The plaintiff's threadbare, conclusory allegations of fraud could not hold up against the expressed written terms of the promissory note. *Id.* Contrarily, Zeikos has pointed to a false statement in this case, and it did sufficiently plead particular facts to show reasonable reliance.

Attempting to move the goal post, Walgreen argues that Zeikos knew of the actual sales of its products but still entered the Amended PPA with Walgreen, thus waiving its fraud claim. The argument fails for the same reason as Walgreen's novation theory. The original PPA—not the Amended PPA—is at the heart of Zeikos's fraud claim. Zeikos allegedly relied on Walgreen's statement that it had achieved the $80–100 million in sales from the Premium Space in the prior year. The alleged fraud is not that Walgreen knowingly provided false, inflated projections of $80–100 million in sales from the Premium Space. This distinction is important. If the alleged fraud concerned projections, then Zeikos may have waived its claim by entering the Amended PPA after discovering the projections were false based on the actual sales numbers. On those hypothetical facts, there could be no reasonable reliance: the actual sales number would explicitly contradict the fraudulent statement. But here, Zeikos alleges it reasonably relied on the historical performance of $80–100 million sales when negotiating and executing the original PPA. The actual sales figure,

at most, reflected a disconnect between Walgreen's past and current performance—not the presence of fraud. In entering the Amended PPA, the parties adjusted their expectations. But Walgreen's apparent inability to reach the $80–100 million figure in the future is immaterial to Zeikos's alleged reliance on Walgreen's false representation about past sales. Between terminating the first contract and entering into a subsequent one, there is no indication that Zeikos discovered, or could have discovered, Walgreen's alleged fraud.

Thus, the fraud claim carries over to the Amended PPA. *See, e.g., Vigortone AG Prods., Inc. v. PM AG Prods.*, Inc., 316 F.3d 641, 644 (7th Cir. 2002) (observing that under Illinois law, "an integration clause does not bar a claim of fraud based on statements not contained in the contract"). To be sure, Walgreen can still dispute whether Zeikos reasonably relied on Gehrke's misrepresentation but again, this question is reserved for the jury, not this Court. *See, e.g., Franklin Cash Reg., Inc. v. Dealzz*, 2022 WL 972292, at *5 (N.D. Ill. Mar. 31, 2022) ("Whether reliance was reasonable is a fact-intensive question inappropriate for resolution at the motion to dismiss stage."); *Glazer v. Abercrombie & Kent, Inc.*, 2007 WL 3120055, at *2 (N.D. Ill. Oct. 23, 2007) ("Based on the specific facts of this case, the issue of whether plaintiffs' reliance on certain documents and statements was reasonable is not appropriate for resolution at the Rule 12(b)(6) motion to dismiss stage of the proceedings.").

Lastly, Walgreen challenges whether the fraudulent statement proximately caused damages to Zeikos. Proximate causation requires cause-in-fact and legal cause. *Phillips v. DePaul Univ.*, 19 N.E.3d 1019, 1032–33 (Ill. App. Ct. 2014). "In the context of a fraud claim, cause-in-fact is 'but for' cause." *Id.* (citing *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 52 (Ill. 2005)). "That is, the relevant inquiry is whether the harm would have occurred absent the defendant's conduct." *Price*, 848 N.E.2d at 52. Legal cause requires that the alleged injury be a foreseeable consequence of the

alleged misrepresentation. *Phillips*, 19 N.E.3d at 1033 (citing *City of Chi. v. Mich. Beach Hous. Coop.*, 696 N.E.2d 804, 811 (Ill. Appt. Ct. 1998)).

Zeikos contends that it would have never entered the PPA had it known the true sales figure from the prior year. Convincingly, Zeikos used its own sales as evidence. Prior to the PPA, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████. Rationally, no company would take on such a losing venture. But in relying on the $80–100 million prior sales record, Zeikos signed the PPA because it was persuaded that the Premium Space could yield significant revenue. Moreover, it was foreseeable that providing inflated, false financial metrics would induce Zeikos to enter an unprofitable contract. Therefore, the Court finds that Zeikos has pleaded sufficient facts to support proximate cause to survive the pleading stage. *See, e.g., In re Rust-Oleum Restore Mktg., Sales Pracs. & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 815 (N.D. Ill. 2016) ("As such, a finding of proximate cause is generally a fact question for the jury and less amenable to resolution on a motion to dismiss.") (internal citation omitted).

Walgreen marshals several arguments to rebut Zeikos's damages allegations. First, Walgreen draws a distinction between paying $5 million and taking $5 million in credit against purchases made. This technicality elevates form over substance. Regardless of the payment characterization, Zeikos lost revenue. And any reliance upon *Duran v. Leslie Oldsmobile, Inc.* is myopic. Illinois courts determine damages based on loss to the plaintiff. *See Mich. Beach Hous. Co-op.*, 696 N.E.2d at 811; *Petty v. Chrysler Corp.*, 799 N.E.2d 432, 439 (Ill. App. Ct. 2003). The *Duran* court found no damages related to the false financing rate because the plaintiff never made any payments—in other words, no loss. *Duran v. Leslie Oldsmobile, Inc.*, 594 N.E.2d 1355, 1364

(Ill. App. Ct. 1992). But here, had the $5 million not been credited against purchases, Zeikos would have received or retained that sum. That is a loss.

Second, Walgreen contends that under Illinois law, a plaintiff pleading fraudulent inducement must choose between performing and seeking damages or rescission. According to Walgreen, as Zeikos rescinded the contract, there were no damages because the $5 million credit was incorporated into the Amended PPA, "a valid and enforceable contract." (Dkt. 120 at 9). That argument is simply a repackaging of the failed arguments above. The choice Walgreen offers— perform and seek damages or rescind—is premised on Zeikos knowing about the fraud. According to Zeikos, it never learned about any fraud prior to entering the Amended PPA. Thus, incorporating the allegedly ill-gotten $5 million under the Amended PPA does not dispose of Zeikos's claim that it suffered a loss under the PPA.

In total, Walgreen's motion to dismiss Count I is denied.

## II.     Breach of Amended PPA (Count II)

Next, Zeikos alleges that Walgreen breached the Amended PPA by failing to place products in the Premium Space across 5,000 stores and improperly displaying Zeikos products in the Premium Space. Under Illinois law, to state a claim for breach of contract, Zeikos must allege (1) the existence of a valid contract; (2) performance by Zeikos; (3) breach by Walgreen; and (4)

damages to Zeikos. *Zirp–Burnham, LLC v. E. Terrell Assocs., Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005).

Under the first breach, Zeikos alleges that Walgreen never had 2,000 stores with Saddle Fixtures. The controlling language is:

> (a) Three Thousand (3,000) stores on a "010 fixture," which is a four (4) shelf fixture located at the front of the store that sits at the beginning of the registers; and (b) Two Thousand (2,000) stores, on a "saddle fixture," which is an acrylic tray that sits on the half shelf in the checkout queue.
> If Walgreen changes the Fixtures or moves such Fixtures to other areas in the stores, Walgreens shall use its best efforts to provide Vendor similar placement during the remainder of the then-current Term with similar amount of customer traffic as the 010 fixture and/or saddle fixture, as applicable

(Dkt. 104-3).

"The issue of contract interpretation is not one for the trier of fact; matters regarding contract interpretation involve questions of law." *Citadel Grp. Ltd. v. Sky Lakes Med. Ctr., Inc.*, 2008 WL 1924958, at *3 (N.D. Ill. Apr. 30, 2008); *see also Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir.1998) ("Contract interpretation, including the question of whether a contract is ambiguous, involves conclusions of law."). Walgreen contends that there was no breach because it did not need to place Zeikos products in 2,000 stores with Saddle Fixtures; rather, the contract allowed Walgreen to place those products in any area with similar amount of customer traffic. Walgreen notes that "[n]othing in this language mandates that any products be placed in the 'Fixtures' before those fixtures are moved or changed."[1]  (Dkt. 120 at 12).

This interpretation is a stretch. The contract provision is best understood as a two-part conditional sequence. The first part requires Walgreen to place Zeikos products in 3,000 stores

---

[1] Walgreen further contends that Zeikos agreed with Walgreen's interpretation of the contract in the Second Amended Complaint. What Zeikos pleaded in the Second Amended Complaint is irrelevant here because the Third Amended Complaint superseded the Second, rendering the latter void. *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 782–83 (7th Cir. 2013). Thus, the Court will not dismiss this count due to inconsistencies between the Second and the Third Amended Complaint. *See, e.g.*, *Whitehouse v. Piazza*, 397 F. Supp. 2d 935, 941 (N.D. Ill. 2005) (citation omitted)

with 010 Fixtures and in 2,000 stores with Saddle Fixtures. The second part states that if Walgreen "*changes the Fixtures or moves such Fixtures*," (Dkt. 104-3), then Walgreen shall use its best efforts to provide similar placement with an equal amount of customer traffic. The italicized language presupposes that Walgreen has already placed the Fixtures in its stores. Logically, Walgreen cannot change or move Fixtures before placing them. And as Zeikos alleges, there were never 2,000 stores with Saddle Fixtures. Under Walgreen's reading of this provision, the second part would render the first part superfluous. *See Regency Com. Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007) ("The agreement is to be interpreted as a whole, giving meaning and effect to every provision when possible, and a court will not interpret the agreement in a way that would nullify provisions or render them meaningless.") (citing *Coles–Moultrie Electric Cooperative v. City of Sullivan*, 709 N.E.2d 249, 253 (Ill. App. Ct. 1999)).

Zeikos appears to have abandoned, and thus waived, its second breach allegation as it failed to retort Walgreen's dismissal arguments. *See, e.g.*, *Calderon v. Vill. of Bridgeview, Ill.*, 2020 WL 1139252, at *3 (N.D. Ill. Mar. 9, 2020) (finding that plaintiff conceded an argument because he failed to address it in his response brief). Regardless, as discussed above, Zeikos's breach of contract claim still survives.

As Walgreen dedicated only one sentence to challenge the damages element, the Court will similarly be brief. The Amended PPA states that "[i]f Walgreens no longer displays the Merchandise on Fixtures in at least 5,000 stores, Walgreen shall refund Vendor a pro-rata portion of the amount Vendor paid Walgreen for such Merchandise placement." (Dkt. 104-3 ¶ 4). Zeikos

alleges that Walgreen did not have fixtures in at least 5,000 stores and is thus entitled to a pro-rata refund that Walgreen has not provided. Zeikos has sufficiently pleaded the damages element.

As a result, the motion to dismiss Count II is also denied.

### III.    Breach of the January 2021 Contract (Count III)

In Count III, Zeikos alleges that (1) Walgreen breached the January 2021 Contract in the same manner as the Amended PPA and (2) prematurely terminated the contract.

Both allegations stem from a common question: can the Court consider extrinsic or parol evidence to complete the contract. "Under the parol evidence rule, extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict a fully integrated writing." *Geoquest Prods., Ltd. v. Embassy Home Ent.*, 593 N.E.2d 727, 729 (Ill. App. Ct. 1992); *see also Sarvis v. BMO Harris Bank*, 2015 WL 2415244, at *6 n.5 (N.D. Ill. May 19, 2015) ("The parol evidence rule excludes evidence of prior or contemporaneous oral and written agreements which would vary a written contract.") (quoting *Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 563 (7th Cir. 2002)). "A party may not introduce parol or extrinsic evidence to show additional consistent terms of a contract unless the writing is incomplete or ambiguous." *Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 956 (Ill. App. Ct. 2001) (citing *Geoquest Prods., Ltd.*, 593 N.E.2d at 730). "The determination of whether a contract is integrated is a question of law for the trial judge to decide." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005). "A written contract is fully integrated when it is intended by the parties to be a complete and exclusive statement of the agreement's terms; a contract is only partially integrated if it is intended

as an incomplete expression (though a final expression on certain terms)." *West Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 674 (7th Cir. 2015).

Starting with the first breach, Zeikos argues that "the parties manifested that the placement obligations from the Amended PPA would continue"—products in 3,000 stores with 010 Fixtures and in 2,000 stores with Saddle Fixtures. (Dkt. 117 at 14). Countering, Walgreen states that the January 2021 Contract did not provide any promise about placement of specific products or obligations to purchase products. (Dkt. 111 at 14). Rather the agreement simply confirms a "Deal" for "20% off invoice deduction for 010/saddle placement." (*Id.*)

The structure and substance of the January 2021 Contract depart sharply from its predecessors, the PPA and Amended PPA. The contract is essentially two charts, one of them being:

Please review the following deal negotiation. Approve by replying to this email and typing your name and the approval date.

| 1 | Category Manager | 027 GEHRKE |
|---|---|---|
| 2 | Vendor Name and Number | ZEIKOS (099158) |
| 3 | Deal Type, Sub-Type, or Business Purpose | 055 Base Allowance |
| 4 | Performance Period | 1/21/21 to 12/31/2021 |
| 5 | Total Estimated Earnings | $2,000,000.00 |
| 6 | Terms of Deal | 20% off Invoice deduction |
| 7 | Means of Collection | Deduction |
| 8 | Billing Calculation Type | Vendor Wide - All items mapped to the CM & vendor will be included in calculation |
| 9 | Billing Frequency | Monthly |
| 10 | Invoice Remarks | 20% deduction for 010/saddle program |

| Walgreens Notes |
|---|
| 20% off invoice deduction for 010/saddle placement |
| For Deal Team: System to Calculate = System, CM to Approve = No, Renewable Reminder = No, Select PO by Buy Date, Calculate Earnings by PO Receipt Amounts, Subtract PO Returns from Earnings = Yes |

(Dkt. 104 ¶ 221; Dkt. 104-5).

The January 2021 Contract, viewed within its four corners, appears more as a term sheet than a contract. Walgreen correctly notes that there is no right to terminate, no product list, and no placement requirements. The chart references a "010/saddle program," alluding to the fixture program in the Premium Space, yet it provides no details about it. (Dkt. 104-5). In sum, not much substance. But both parties agree that the January 2021 Contract is a valid contract. According to

Zeikos, after the signing, the parties continued business as usual—"Walgreen began placing orders and Zeikos shipped products in response." (Dkt. 104 ¶ 136). Neither party suggests that there were significant changes to how business was conducted before and after the agreement. As such, the Court is convinced that the threadbare January 2021 Contract cannot possibly be interpreted as a "complete and exclusive statement of the agreement's terms." *West Bend Mut. Ins. Co.*, 794 F.3d at 673. There must be something more.

To that end, the Court turns to the Amended PPA and past practices for clarification. *See Barwin v. Vill. of Oak Park*, 54 F.4th 443, 464 (7th Cir. 2022) ("Logically, unless an agreement itself names and delineates the contours of a given practice, extrinsic evidence is the only way a practice can be identified."); *Vill. of Oak Lawn v. Oak Lawn Pro. Firefighters Ass'n*, *Loc. 3405 IAFF*, 2011 WL 10068742, at *19 (Ill. App. Ct. June 30, 2011) (approving the use past practices to ascertain meaning and intent in ambiguous contract). When the parties entered the January 2021 Contract, they referenced the "010/saddle program." Without more, the Court assumes that it refers to the same program in the Amended PPA and PPA—from October 2019 to December 2020, Walgreen was required to place Zeikos products in 3,000 stores with 010 Fixtures and in 2,000 stores with Saddle Fixtures. Thus, absent any contrary intentions or evidence, those terms are still at play in the January 2021 Contract. And as Zeikos learned through discovery, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Altogether, Zeikos alleged sufficient facts to show that Walgreen breached the January 2021 Contract.

Regarding the second breach, Walgreen insists that the parties' General Trade Agreement ("GTA") governs the right to terminate the January 2021 Contract. The GTA "sets forth the terms and conditions under which the parties agree to facilitate their purchase and sale transactions" and that "[t]he terms and conditions contained herein shall apply to all merchandise." (Dkt. 111-1 at

1). As understood, the GTA defines the general logistical relationship between parties while additional contracts, like the January 2021 Contract, fills in the specifics. The GTA's termination provision states:

> This Agreement [GTA] shall remain in effect until terminated by either party on thirty (30) days' prior written notice, which notice shall specify the effective date of termination; provided however, that any termination shall not affect the respective obligations or rights of the parties arising under any Documents or otherwise under this Agreement prior to the effective date of termination."

(Dkt. 111-1 at 8). As the January 2021 Contract is a transaction of merchandise between the parties, the argument goes, GTA's termination provision applies, and Walgreen was not in breach when it terminated the contract before the end of the performance period. Zeikos disagrees—it seizes upon the first two words "[t]his Agreement" and argues that the above termination right only applies to the GTA. On the other hand, Zeikos points to the January 2021 Contract's performance period and a draft agreement to supplement the January 2021 Contract as evidence that neither party can unilaterally terminate the contract earlier unless to prevent automatic renewal. As the January 2021 Contract was not fully integrated, the Court can also look to extrinsic evidence, like GTA and draft agreement, to resolve the early termination question.[2]

Both parties are only partially correct. At the outset, the Court finds Zeikos's interpretation of the GTA termination provision to be more persuasive. That provision explicitly states that the GTA, the master agreement governing the parties' relationship at large, shall remain in effect unless terminated with 30 days' prior written notice. It references "Documents," or other contracts, but the language does not suggest the 30 days' requirement applies to those Documents. While the GTA does govern terms for all purchases and sales of products, there is a distinction between terms

---

[2] On a motion to dismiss, the Court may consider "documents that central to the complaint and are referred to in it." *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621–22 (7th Cir. 2020) (quotation omitted). Walgreen attached the GTA to its motion to dismiss. The Court finds it central to Plaintiff's operative complaint and the GTA can be properly considered at this stage.

applying only to the GTA versus to all merchandise transactions with vendors. A straightforward reading of the provision suggests the provision falls under the former. *See, e.g.*, *LaSalle Bank Northbrook v. Am. Speedy Printing Centers, Inc.*, 1992 WL 208975, at *3 (N.D. Ill. Aug. 21, 1992) ("Contract language must be construed literally in a straightforward manner, giving full force and effect to each provision."). Had Walgreen decided to terminate its entire relationship with Zeikos, and consequently the January 2021 Contract as well, the GTA's termination provision would certainly control. But here, the termination was far narrower—only the exclusive Zeikos relationship involving the Premium Space and the purchases of products associated with the fixtures were ended. (Dkt. 104 ¶ 148). Absent any other evidence, the overall business relationship appeared to have survived. So the Court cannot find that the GTA's termination provision applies to the January 2021 Contract.

But even under Zeikos's interpretation, Zeikos still failed to show that Walgreen was in breach for early termination. The January 2021 Contract's performance period merely indicates the lifespan of the transaction; it alone provides no guidance on the termination procedure. And looking to the same draft agreement that Zeikos cited for support, the Court arrives at a different conclusion—there was no breach. According to the draft agreement, there were three options to terminate: (1) the January 2021 Contract "will automatically renew for additional one (1) year periods unless one Party provides the other party at least sixty (60) days' prior written notice of its intention to terminate this Agreement at the end of the then-current Term"; (2) "[e]ither party may terminate the Agreement for any or no reason by giving at least sixty (60) days' written notice of termination to the other party"; and (3) "[e]ither party may terminate this Agreement upon fifteen (15) days' written notice if the other party fails to cure a breach of this Agreement." (Dkt. 104 ¶ 137). Zeikos's argument—that Walgreen cannot rely on the second option because it only allowed

24

for termination to prevent automatic renewal—is unreasonable. (*Id.* at ¶ 138). The Court finds no contextual evidence to latch such a condition. Rather, the plain language states a party may terminate "for any or no reason." Moreover, the first option already allows for a party to terminate the contract to prevent automatic renewal. Adopting Zeikos's interpretation would render the first option redundant. *See Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1112 (7th Cir. 1992) (noting that an interpretation rendering a term redundant "would violate the principle of contract interpretation which requires courts to construe terms so as to avoid rendering other terms redundant or meaningless"). Based on Zeikos's own evidence, Walgreen had the right to terminate the January 2021 Contract with 60 days' prior written notice.

Overall, Zeikos has still adequately pleaded a breach-of-contract claim. Thus, Count III survives.

### IV.    Failure to Pay for Sold and Delivered Goods

Finally, Zeikos claims that Walgreen failed to pay for sold and delivered goods. Since Walgreen construes this as another breach-of-contract claim—a characterization Zeikos does not dispute—the Court treats it as such. According to Zeikos, Walgreen received invoices for Zeikos products and then took credits off. Some deductions were legitimate; others were not. When Zeikos allegedly disputed the illegitimate deductions, Walgreen would sometimes reimburse Zeikos. Other times, Walgreen ignored the requests.

In a prior Order dismissing this claim, the Court chastised Zeikos for failing to clarify "as to what exactly Walgreens purchased and paid." (Dkt. 99 at 10). In its Complaint, Zeikos has provided several charts detailing disputed payments. Despite its effort, Zeikos's claim still falls short. Courts in this District are split on "whether a plaintiff bringing a breach of contract claim must identify the particular provision of the contract that was allegedly breached." *Danqing Hou*

*v. Synchrony Bank*, 2020 WL 2128729, at *3 (N.D. Ill. 2020). Still, "[a] majority of courts in the district have found that a plaintiff is not required to cite a specific contract provision, 'but must at least place the defendant on fair notice of the contractual duty it breached.'" *US Dealer License, LLC v. US Dealer Licensing LLC*, 2019 WL 7049927, at *4 (N.D. Ill. Dec. 23, 2019) (quoting *Stark v. Select Portfolio Servicing, Inc.*, 2017 WL 6988657, at *2 (N.D. Ill. Dec. 18, 2017)).

While Zeikos provided significant details about damages, it failed to allege sufficient facts to show that a breach occurred. Zeikos does not need to point to a specific contractual provision, but, at the very least, it must show there was a contract. For example, Zeikos alleges its entitlement to reimbursement where "Walgreen placed purchase orders with Zeikos for non-Premium Space Products." (Dkt. 104 ¶ 238). The Complaint contains no other references to transactions involving non-Premium Space products. (*See generally id.*) None of the three contracts at issue reference non-Premium Space products. So the Court can only speculate as to terms of that transaction. Similarly, Zeikos alleges that "during the [Amended PPA], Walgreen improperly took credits for more defective returns than Walgreen actually returned to Zeikos." (*Id.* at ¶ 155). Rather telling, Zeikos did not say that Walgreen breached the Amended PPA when it improperly took credits. That is because the Amended PPA says nothing of defective merchandise, the return process, or invoice credit deduction. (*See generally* Dkt. 104-3). And Zeikos has failed to point to any extrinsic evidence to guide the Court in its analysis.

There lies one exception. As to the January 2021 Contract, Zeikos alleges that Walgreen improperly deducted additional credits for defective products after Zeikos gave Walgreen a 2%

credit off the invoice price in satisfaction of all products, regardless of defect. Because the 2%

discount term appears in the contract, Walgreen's alleged deductions reflect a plausible breach.

Thus, Zeikos's breach-of-contract claim in Count IV may proceed as to the disputed

amounts under the January 2021 Contract. The remaining theories in Count IV are dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Walgreen's motion to

dismiss. Counts I–III are denied in its entirety and Count IV is partially dismissed.

Virginia M. Kendall
United States District Judge

Date: November 30, 2023