# Exhibit AJ

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ZEIKOS, INC., | Case No. 1:23-cv-00303 |
| Plaintiff, | Hon. Virginia M. Kendall |
| v. | Magistrate Judge Keri L. Holleb Hotaling |
| WALGREEN CO., | |
| Defendant. | |

**WALGREEN CO.'S WRITTEN RESPONSES TO ZEIKOS RULE 30(B)(6) TOPICS**

Plaintiff Zeikos, Inc. ("Zeikos") and Defendant Walgreen Co. ("Walgreens"), in the course of their meeting and conferring concerning Zeikos' Superseding Rule 30(b)(6) Notice, agreed that certain Topics listed in that notice would be answered in writing and Walgreens does so here.

In providing these answers, Walgreens states that it is identifying as to each queried contention the material facts and some of the supporting evidence. This is consistent with the law of this District, which does not require a party to provide "every fact and piece of evidence" that supports a contention where it "offers the principal or material facts that support its contention." *United States ex rel. Gill v. CVS Health Corp.*, No. 18 C 6494, 2024 U.S. Dist. LEXIS 106998, at *12 (N.D. Ill. June 17, 2024). There are multiple documents and witnesses that support the contentions here. No deadline has been set in this case for disclosure of either trial witnesses or exhibits and Walgreens reserves the right to utilize the testimony of the witnesses and exhibits it discloses for trial when it is time to do so. For now, the general substance of the facts on which Walgreens intends to rely concerning the queried contentions is as follows.

**Topic 68. The factual and evidentiary basis for Walgreen's denial of the allegations in paragraphs 3, 4, 42, 75, 79, 82, 83, 93, 114, 118, 120, 121, 141, 154, 172, 173, 174, 180, 189, 198, 205, 211, 212, 213, and 222 of Zeikos's third amended complaint, filed June 26, 2023.**

For each of the paragraphs of the Third Amended Complaint listed in this topic, Walgreens first sets out the allegation and then provides a response.

3.      Walgreen also breached its obligations to Zeikos under that contract. As Zeikos has learned through discovery in this action: (i) While Walgreen promised to put Zeikos's products in 2,000 of its stores with Saddle Fixtures, Walgreen put Zeikos's products in less than about 1,327 stores with the Saddle Fixtures; (ii) While Walgreen promised to put 22 specific Zeikos products in these Saddle Fixtures, Walgreen never put more than 16 of those products in these Saddle Fixtures; and (iii) While Walgreen promised to put 22 specified premium space products in 2,000 stores with Saddle Fixtures and 26 premium space products in 3,000 stores with 010 Fixtures, Walgreen never met those obligations, all of which caused Zeikos damages.

**ANSWER:** Walgreens' Answer stated that Walgreens is without information as to what Zeikos contends it learned in discovery but otherwise Walgreens denied the allegations of Paragraph 3 based on the following.

The Amended and Restated Product Placement Agreement (the "Amended PPA") referenced in Paragraph 3 provides that during its term Walgreens will place the merchandise listed on Exhibit A to the contract (defined as the "Merchandise") in 5,000 stores, determined by Walgreens, on certain fixtures (the "Fixtures") as follows:

(a) Three Thousand (3,000) stores on a "010 fixture", which is a four (4) shelf fixture located at the front of the store that sits at the beginning of the registers; and
(b) Two Thousand (2,000) stores, on a "saddle fixture", which is an acrylic tray that sits on the half shelf in the checkout queue.

If Walgreen changes the Fixtures or moves such Fixtures to other areas in the stores, Walgreen shall use it best efforts to provide Vendor similar placement during the remainder of the then-current Term with similar amount of customer traffic as the 010 fixture and/or saddle fixture, as applicable.

2

Walgreens documents produced in discovery demonstrate that Walgreens more than met its contractual obligations, placing the Merchandise in more than 7,000 stores on either 010 or acrylic topper fixtures in the Premium Space in those stores. *See, e.g.,* WAG08840-41. Walgreens has also produced sales data establishing that more than 7,000 stores had sales of Premium Goods. *See* WAG14522. When Walgreens sent its 60-day notice to terminate its relationship with Zeikos, the then-current spreadsheet showing stores with Premium Space products on the "010 fixture" and acrylic toppers, all located within the Premium Space, identified more than 7,000 stores. *See* WAG07387, WAG07388. Walgreens' data establishes that Zeikos' products were in the Premium Space in the required number of stores, and often times significantly more than the required number of stores – at least on those occasions when Zeikos delivered the products that Walgreens ordered. *See, e.g.,* WAG14522.

During the term of the Amended PPA, Zeikos was unable to deliver Walgreens' required quantities of Premium Space goods. *See, e.g.,* WAG13331. Zeikos has admitted this, conceding that the "Covid-19 Pandemic disrupted the supply chain, creating an impossibility of Zeikos performing certain obligations to deliver products in response to Walgreen's orders." Dkt. 138 at 15. Zeikos' inability to deliver products impacted Walgreens' ability to stock products in the Premium Space since Walgreens could not stock what Zeikos failed to deliver. Zeikos' claim that it was damaged by Walgreens' alleged failure to place more of its products in more fixtures in more stores is negated by Zeikos' inability to deliver those products that Walgreens did order. Regardless, at all times Walgreens exercised its best efforts to display and sell Zeikos' products from the Premium Space, including because it was always in Walgreens' best interests to do so.

Notably, Zeikos knew the number of stores that its products were placed in throughout the contract period, including the number of stores that had no inventory based on short or missing

deliveries by Zeikos. This was provided to Zeikos by Walgreens on a constant basis throughout the parties' contractual relationship through SupplierNet, which is the online system by which Walgreens' vendors communicate with Walgreens and vice-versa. In addition, Walgreens separately communicated this information to Zeikos. *See, e.g.,* WAG06166-6170.

4.     In a subsequent one-year agreement between the parties concerning the premium space – which contained no fixed payment but a 20 percent discount – Walgreen again failed to perform its obligations to put Zeikos products in 5,000 stores and also terminated the one-year agreement four months early, which caused Zeikos damages.

**ANSWER:** Walgreens denied the allegations of Paragraph 4 because there is no evidence that the parties agreed to "a subsequent one-year agreement." Instead, the evidence is that there was an exchange of proposals and counterproposals that resulted in a deal that had no specific term, identified no particular products, and promised no particular number of stores where any products would be placed. This is confirmed by what Zeikos itself alleges were the "material terms" of the referenced agreement, pleaded at Paragraph 131 of its Third Amended Complaint. Furthermore, to the extent any agreement was formed by the exchange of proposals in January 2021, as the Court found, "[b]ased on Zeikos's own evidence, Walgreen had the right to terminate the January 2021 Contract with 60 days' prior written notice." Dkt. 124 at 25. Accordingly, no agreement was terminated early and Zeikos suffered no damages.

Answering further, Walgreens incorporates its response to Paragraph 3 herein concerning the placement of Zeikos products in the Premium Space and Zeikos' inability to deliver the products that Walgreens did order, which became increasingly problematic during 2021, resulting in hundreds of instances in which Zeikos provided no stock of products for Walgreens to sell. This is referred to as "store outs" and the number of such instances were constantly reported to Zeikos through Walgreens' SupplierNet system. Walgreens has further produced and identified its

4

contemporaneous communications with Zeikos concerning these issues and Zeikos' pervasive failure to deliver products when ordered. *See, e.g.,* WAG06460 - WAG06462; WAG06439; WAG07471 - WAG07472; WAG07476; WAG07484; WAG13461 - WAG13462; WAG13464 - WAG13465; WAG13466; WAG13467 - WAG13469; WAG13470 - WAG13471; WAG10239 - WAG10243; WAG06470 - WAG06474.

    42. As Zeikos learned through discovery in this action, (a) Walgreen's actual sales of "Infinitive" brand products in the last fiscal year from the Premium Space were no more than $43.6 million, (b) Walgreen internally projected that annual sales of Zeikos products from the Premium Space would be no more than $64 million, and (c) Burg and Corbett considered sales of more than $100 million of Zeikos products – during the first year of the contract – unrealistic.

**<u>ANSWER:</u>** Walgreens Answer stated that Walgreens is without information as to what Zeikos contends it learned in discovery but otherwise Walgreens denied the allegations of Paragraph 42 based on the following.

Actual sales of Infinitive brand products from the Premium Space are not knowable because the Infinitive brand products were sold at multiple places in Walgreens' stores and sales from particular places in the stores were not tracked. While Walgreens denies that Albert Gehrke told Zeikos any figure for prior year Infinitive Sales before Zeikos agreed to the initial Product Placement Agreement (the "PPA") – as Zeikos alleges – total sales of Infinitive-brand products between May 2018 and May 2019 were $98,061,336. WAG09831. The PPA was agreed to in October 2019 and other Walgreens documents show one-year sales of Infinitive-brand products (*i.e.*, not May-to-May) in 2018 of $107,437,022; in 2017 of $135,319,150; in 2016 of $152,454,028; and in 2015 of $128,781,011. WAG13459.

Other internal Walgreens documents produced in discovery have what are at best rough estimates of the portion of Infinitive sales in the year prior to the PPA that could possibly be attributed to Premium Space sales. The reference to $43.6 million in Paragraph 42 of the Third

Amended Complaint appears to refer to a particular document marked as PX20(b) during depositions in the case. That figure appears to be based on 16 particular "WICs" or individual Infinitive products whereas the planograms for the Premium Space show as many as 23 Infinitive Products being sold from that space. It is unclear what period of time to which PX20(b) refers even for the 16 WICs it seems to be based upon. As such, that number is not a statement of total sales of all Infinitive products from the Premium Space for any particular period of time. Other documents produced in discovery include a contemporaneous internal estimate of $53.3 million in Infinitive sales from the Premium space in the prior year (WAG08336 at WAG08337) but no such documents purports to state actual sales and Walgreens did not rely on any such documents for the purpose of knowing actual Infinitive sales. Rather, the documents were created to make a business case for the new program with Zeikos. Their purpose was not to provide an exact statement of actual sales from the Premium Space (which were unknowable, as stated above), but rather to give a sense of whether it was worthwhile for Walgreens to invest in new fixtures required as part of the program.

Given that the Premium Space was called "Premium" and considered valuable by both Walgreens and vendors like Zeikos because it generated more sales than other parts of the store, it follows that the quantity of sales from the Premium Space would be higher than from other places in the store. There is, however, no way to know what proportion of the up to $152 million in annual sales of Infinitive products in the prior years were from the Premium Space.

Walgreens further states that the sales of the Infinitive brand products were generally trending downward in the three years before the PPA, as noted above. That was why Walgreens was seeking an alternative vendor with knowledge and expertise in the consumer electronics area, and with capacity to provide needed goods, which Walgreens told Zeikos. Zeikos in turn assured

Walgreens that it had the knowledge and expertise to increase sales and get them back "on track." *See* Gehrke Tr. at 139-40 & 178.

No sales projections were created for the Zeikos Premium Space Products. Thus, there is no evidence that Walgreens ever made a sales projection of $100 million nor is there any evidence that Burg or Corbett considered what the sales of Zeikos products would be, or that sales of more than $100 million was unrealistic. Corbett specifically testified that no projection was done at the time when the company was evaluating going forward with the program. Corbett Tr. at 167-68 & 195-96; *see also* Gehrke Tr. at 209 & 255. Based on what he had been told by Zeikos that it believed it could sell, Gehrke did believe that Zeikos sales could exceed $100 million in the first year. Gehrke Tr. at 204. Chris Burg and Amanda Corbett did not think Walgreens' leadership should be given that expectation, however, in the business case for buying new fixtures. Thus, Burg testified to a version of the internal business case that foresaw $74.8 million in sales for Zeikos in the first year. Burg Tr. at 140.

> 75.     Suhajda knew that her statement "I wanted Ben to get something out to you last week as we waited for additional planogram information to come in. I will check CFP today to see if it has updated with all the additional stores we were not expecting" was misleading. Those manual projections were based upon, and only upon, Clone WICs and Gehrke's forecasts of sales increases of the new products over the Clone WICs. The additional "planograms" or additional "stores" would not impact the manual projections. Moreover, because CFP, an acronym for Collaborative Forecasting Process, was based upon actual sales, and actual sales of the Premium Space Products would not begin until November 15, 2019, Suhajda's statement that "I will check CFP today" had no purpose other than to placate Zeikos. Trappani believed Suhajda.

**ANSWER:**     Walgreens Answer stated that Walgreens is without information as to what Zeikos contends it learned in discovery but otherwise Walgreens denied the allegations of Paragraph 75 based on the following facts.

Denise Suhajda's statement in the referenced email were true, were not misleading and were not made to placate Zeikos. As Suhajda testified, the planograms that would be loaded into

CFP would identify the number of stores into which products would be placed and "if it was in more stores, then the sales forecast could be higher. So it would have affected -- it wouldn't have affected the clone WIC; it would have affected the sales forecast." Tr. at 68. Accordingly, and again as Suhajda confirmed in her deposition, her statements referenced here were true and not misleading.

79.     As Zeikos has learned in discovery, Walgreen has either failed to create, or spoliated, documents concerning its distribution of each of the Premium Space Products to the Premium Space in each of its stores. In a document request dated May 31, 2022, Zeikos sought Walgreen's "[d]ocuments sufficient to identify by SKU, Zeikos's Premium Space Merchandise, in terms of number of units, that Walgreen[s] shipped to each of the Participating Stores during the Contact [sic] Time Period, and the dates on which the merchandise was shipped." In its response dated May 5, 2022, Walgreen objected but stated that "to the extent such documents exist, it will produce non-privileged, responsive documents." In a joint letter to the Court on August 16, 2022, Zeikos moved to compel Walgreen to produce these documents, and others. The Court on October 11, 2022, ordered Walgreen to produce its responsive documents, including documents responsive to Request 46, by December 15, 2022. By email on June 1, 2023, Walgreen produced a responsive document concerning Walgreen's distribution of Premium Space Products, beginning in March 2021, but Walgreen failed to produce any documents concerning Walgreen's distribution of Premium Space Products before March 2021. This forced Zeikos to examine other types of Walgreen data, including Walgreen's data concerning mylar label counts.

**ANSWER:**     Walgreens Answer stated that Walgreens is without information as to what Zeikos contends it learned in discovery but otherwise Walgreens denied the allegations of Paragraph 79 because the information allegedly not created or else "spoliated" was in fact produced at WAG13460.

82.     While Walgreen promised in the Product Placement Agreement, and in the later revised agreement, that the Saddle Fixtures would contain 22 specified products listed on its Exhibit A, Walgreen instructed its stores with Saddle Fixtures to place only 16 of the 22 specified Exhibit A products in the Saddle Fixtures, as follows.

**ANSWER:**     Walgreens admitted that it produced the chart that follows the allegations in Paragraph 82, which represents placement guidance for one fixture for one week in November

8

2019. Walgreens otherwise denied the allegations of Paragraph 82 inconsistent with that chart based on the following facts.

The PPA and Amended PPA define "saddle fixture" as "an acrylic tray that sits on the half shelf in the checkout queue." Walgreens has produced planograms for such acrylic trays that establish the Premium Space Products were placed on more than just the single topper that Zeikos considers to be the Saddle Fixture. *See, e.g.,* WAG07388; *see also* planograms from June 10, 2024, production. It is false that Walgreens placed only 16 Zeikos products on "acrylic trays that sit on the half shelf in the checkout queue," *i.e.* on saddle fixtures, as defined in the PPA and Amended PPA. It is further false that the PPA or Amended PPA specified that the "Saddle Fixtures" would contain 22 items from the list of Merchandise.

83. In addition, from the signing of the Product Placement Agreement on October 7, 2019, until February 27, 2020 (the date of a Walgreen letter described below), Walgreen did not have any more than 3,337 stores in the United States that had either 26 products in the 010 Fixture or 22 products in the Saddle Fixture, and probably had a lot less. Based upon the mylar labels that Walgreen had placed in the Premium Space, the following Premium Space Products were in the following number of stores for the following weeks.

**ANSWER:** Walgreens denied the allegations contained in Paragraph 83 based on the facts stated in its response to Paragraph 3 above. Answering further, mylar counts do not establish the number of stores where products were displayed in the Premium Space. During the relevant period, stores could print their own mylar labels. *See* Gehrke Tr. at 287-89. Accordingly, there is no factual basis for Zeikos' assumption that the number of mylars that were sent to stores (rather than printed by them) is a reliable proxy for store placements. The documents and facts referenced in response to Paragraph 3 above more accurately evidence what stores and in what location the Premium Space goods were placed for sale.

93. As Zeikos has learned through discovery in this action, Walgreen's internal data at the time, including Walgreen's planograms, fixture counts, and mylars labels, demonstrated that Walgreen had failed to meet its obligations under the Product Placement

Agreement. For example, as of February 2020, Walgreen knew that (i) it did not have 2,000 stores with Saddle Fixtures, (ii) only 16 of the 22 Premium Space Products were placed in the Saddle Fixtures, and (iii) no more than about 3,336 of Walgreen's stores had mylar labels for all the Premium Space Products in compliance with the Product Placement Agreement. Gehrke nevertheless failed to disclose to Zeikos these deficiencies in Walgreen's performance.

**ANSWER:** Walgreens Answer stated that Walgreens is without information as to what Zeikos contends it learned in discovery but otherwise Walgreens denied the allegations of Paragraph 93 based on the facts described in Walgreens' answers above concerning Paragraphs 3, 82, and 83. As explained therein, none of the factual assertions that Zeikos alleged in this paragraph that it "learned" in discovery, including those numbered (i)-(iii) in this allegation, are true.

114. In any event, Zeikos did not know when it agreed to enter into the revised agreement many of the facts concerning Walgreen's fraud, and the extent of Walgreen's breach of the Product Placement Agreement. For example, Zeikos did not know at that time that (i) Walgreen had sold less than $43.6 million from the Premium Space in the prior year, (ii) Walgreen had never sold more than $55 million from the Premium Space, (iii) Walgreen internally projected no more than $64 million of Zeikos's sales from the Premium Space, (iv) Walgreen had fewer than about 1,237 stores with Premium Space Products in the Saddle Fixtures, or that (v) Walgreen had placed only 16 of the required 22 products in the Saddle Fixtures.

**ANSWER:** Walgreens denied the allegations contained in Paragraph 114 because Walgreens committed no fraud and the factual assertions claims that Zeikos asserts it "did not know" are not actually true, as explained in Walgreens answers above concerning Paragraphs 3, 42, 82, and 83.

118. During the more than 12 months of the Amended and Restated Product Placement Agreement, Walgreen imposed on Zeikos, and Zeikos paid to Walgreen, its requested OTIF charges, and thereby fully compensating Walgreen for any deficiency in Zeikos's performance.

**ANSWER:** Walgreens denies the allegations contained in Paragraph 118 because OTIF, also known as OTFR, charges are imposed as fees agreed to by contract between Walgreens and its vendors. Those charges are not liquidated damages and do not compensate Walgreens for any

damages it suffers as a result of late delivery or failure to deliver products. Consistent with these facts, Walgreens Shipping and Routing Guide explains that these charges are calculated based upon the cost of goods that are short, not to compensate for damages. *See* WAG11335.

120.    As Zeikos has learned through discovery in this action, while Walgreen promised in the Amended and Restated Product Placement Agreement that Walgreen would place 22 of the specified products on Exhibit A in the Saddle Fixtures, Walgreen instructed its stores with Saddle Fixtures, to place only 16 of those 22 Exhibit A products in the Saddle Fixtures. Beginning April 4, 2020, Walgreen instructed employees to place 16 of the Premium Space Products in the Saddle Fixtures as follows.

**ANSWER:**    Walgreens Answer stated that Walgreens is without information as to what Zeikos contends it learned in discovery. Walgreens admitted that it produced the chart that follows the allegations in Paragraph 120, which represents placement guidance for one fixture for one week in April 2020. Walgreens otherwise denied the allegations of Paragraph 120 inconsistent with that chart based on the facts described in Walgreens' answers above concerning Paragraphs 3, 82, and 83. Also, as noted above, the Amended PPA does not specify that 22 of the products on Exhibit A would be placed in the "Saddle Fixtures."

121.    From the signing of the Product Placement Agreement on October 7, 2019, until the end of the term of the Amended and Restated Product Placement Agreement on December 31, 2020, and based upon Walgreen's mylar label counts, Walgreen had no more than about 3,337 stores in the United States that had either 26 products in the 010 Fixtures or 22 products in the Saddle Fixtures, and probably had substantially less. The spreadsheet annexed as Exhibit D, which is incorporated by reference as if set forth in full, shows, for each of the 26 Premium Space Products, the number of Walgreen stores from February 29, 2020, through December 26, 2020, that had a mylar label for that product.

**ANSWER:**    Walgreens Answer stated that Walgreens is without information as to what Zeikos contends it learned in discovery. Walgreens admitted that it produced the spreadsheet attached as Exhibit D to the Third Amended Complaint and referenced in Paragraph 121 but denied the allegations about that spreadsheet because it is not true that the spreadsheet identifies every mylar label in every Walgreens store from February 29, 2020, to December 26, 2020. Specifically,

that document was based on labels shipped to stores and does not account for mylar labels printed in the stores. The document does not reflect any survey or other review of mylar labels in stores. Moreover, mylar labels are not, as already explained, a reliable proxy for the number of products for sale in each store from the Premium Space. Answering further, Walgreens incorporates here its answers with regard to Paragraphs 3, 82 and 83.

141.    Zeikos materially performed its obligations to Walgreen under the January 2021 Contract.

**ANSWER:**    Walgreens denied the allegations of Paragraph 141 because the exchange throughout 2021 and until Walgreens terminated the parties' relationship, Zeikos did not deliver to Walgreens the products necessary to fulfill the Premium Space, or 010, program and as ordered by Walgreens. Zeikos has admitted as much, blaming the COVID-19 pandemic or delays at the ports of entry to the United States in 2021, *see* Dkt. 138 at 15, but there is no dispute that Zeikos did not deliver what it promised to Walgreens. These failures by Zeikos were material to Walgreens because the Premium Space to which Walgreens agreed to grant Zeikos exclusive placement was among the most valuable spaces in Walgreens' stores, near the counter where customers check out. When Zeikos failed to deliver, Walgreens could not put other goods in the resulting empty places it had promised to Zeikos, consistent with its planograms. This cost Walgreens significant sales and undermining the customer experience because no customer wants to see empty shelves or fixtures in a store. Zeikos' failures were pervasive and widespread, including over 1,000 purchase orders that Zeikos failed to fulfill. *See* WAG13331. Answering further, Walgreens incorporates its answer above concerning Paragraphs 3 and 4.

154.    Second, during the January 2021 Contract, Walgreen took credits for products that Walgreen returned to Zeikos, despite the fact that the January 2021 Contract did not allow Walgreen to return those products to Zeikos for a credit. Under the January 2021 Contract, Walgreen took a credit for products Walgreen returned to Zeikos on the basis that they were defective. However, under the January 2021 Contract, Zeikos gave Walgreen a 2

percent credit off the invoice price in satisfaction of all products that Walgreen claimed to be defective. The credits that Walgreen improperly took on this basis, that Zeikos disputed, and that Walgreen did not reimburse Zeikos through a partial credit, totaled $131,742.22, and are summarized below.

**ANSWER:** Walgreens admitted that Zeikos disputed the credits listed in Paragraph 154 but otherwise denied the allegations of Paragraph 154 because the 2% allowance referenced refers to damaged or defective goods sold after the terms of the January 2021 deal were exchanged. This credit concerned returns and different products.

172.  Zeikos, and specifically Saideh and Trappani, relied upon the Representation of Walgreen in deciding whether to enter into the Product Placement Agreement and to promise to pay Walgreen $9 million. At all times between Gehrke's Representation on May 14, 2019, and the execution of the Product Placement Agreement on October 7, 2019, Saideh and Trappani believed that the Representation was true.

**ANSWER:** Walgreens denied the allegations in Paragraph 172 because it denies that the "Representation" was made and so neither Zeikos, Saideh or Trappani could have relied upon it. Mr. Gehrke has testified to this. Gehrke Tr. at 143. Moreover, the alleged representation was that "Walgreen had sold between $80 million and $100 million of 'Infinitive' brand products in the prior year from the Premium Space." If that were true, based on the agreement that Walgreens' margin would be 70%, Zeikos would have expected $24 to $30 million in purchases by Walgreens. Based on documents Zeikos has produced in discovery, this would have nearly doubled Zeikos total sales to all of its customers, which was just $23 million in 2018 and $29 million in 2019 (though a significant portion of the 2019 sales figure is comprised of the opening order by Walgreens under the PPA). *See* Z050501. There is no evidence that Zeikos took any step to double its sales capacity, which it would have had to do if it was truly acting in reliance on the supposed "Representation."

173.  Before the execution of the Product Placement Agreement, Saideh and Trappani used the Representation to consider the sales that Zeikos could expect under the Product

13

Placement Agreement, the prices Zeikos could offer Walgreen for the Premium Space Products, Zeikos's potential gross profit under the Product Placement Agreement, and the likelihood of reaching the goal of $100 million in retail sales from the Premium Space and triggering Zeikos's right to renew the Product Placement Agreement for a second year, with a $3 million built-in profit.

**ANSWER:** Walgreens denied the allegations of Paragraph 173 for the same reasons as it denied the allegations in Paragraph 172.

174. Zeikos reasonably relied upon the Representation. Gehrke, as the Category Manager for the Electronics Category, had scheduled a meeting on May 14, 2019, with Saideh and Trappani to discuss the Premium Space and the Representation was part of this discussion. Gehrke was ideally placed within Walgreen to know the amount of "Infinitive" brand products Walgreen had sold from the Premium Space in the prior year. Zeikos had enjoyed a productive business relationship with Walgreen since 2011, with no history of deception by Walgreen.

**ANSWER:** Walgreens admitted in its Answer that a meeting took place on May 14, 2019, between Albert Gehrke and Zeikos but otherwise denied Paragraph 174 for the same reasons as Paragraphs 172 and 3 above, including because the "Representation" was never made and because neither Gehrke or anyone else at Walgreens was in a position to know the amount of "Infinitive" branded product sales from the Premium Space in the prior year. Walgreens agrees that there was no history of deception by Walgreens at any time during its relationship with Zeikos.

180. Zeikos reasonably relied upon the facts that it knew, which were conveyed or omitted by Walgreen representatives in the course of their employment, when entering into the Product Placement Agreement. Zeikos had enjoyed a productive business relationship with Walgreen since 2011, with no history of deception by Walgreen. If Walgreen had disclosed the Omitted Fact, Zeikos would not have entered into the Product Placement Agreement and promised to pay Walgreen $9 million.

**ANSWER:** Walgreens admitted in its Answer that prior to the PPA, it had previously enjoyed a productive relationship with Zeikos with no deception during any time by Walgreens. Walgreens otherwise denied Paragraph 180 because it denies both that the "Representation" was made or that there was an "Omitted Fact," as those terms were defined in the Third Amended

Complaint. Answering further, Walgreens incorporates its response concerning Paragraphs 3 and

172 and 180 above.

189.    Zeikos reasonably relied upon the Representation in deciding whether to enter into the Product Placement Agreement and to promise to pay Walgreen $9 million, for the reasons set forth in section I. above.

**ANSWER:**    Walgreens denied the allegations of Paragraph 189 for the same reasons as

Paragraphs 3, 172 and 180 above, including because the "Representation" was never made.

198.    Zeikos relied upon the facts that Walgreen had presented to Zeikos concerning Walgreen's ability to sell $100 million of Premium Space Products from the Premium Space in one year.

**ANSWER:**    Walgreens denied the allegations of Paragraph 198 because it is not true that

Walgreens ever "presented any facts" to Zeikos concerning Walgreens' ability to sell $100 million

of Premium Space Products from the Premium Space in one year. Indeed, the complaint does not

so much as allege that Walgreens ever presented any such facts to Zeikos. Answering further,

Walgreens incorporates its answers concerning Paragraphs 3, 172, and 180 above.

205.    Zeikos materially performed its obligations under the Amended and Restated Product Placement Agreement.

**ANSWER:**    Walgreens denied the allegations of Paragraph 205 based on the facts and

evidence described above concerning Paragraphs 3 and 141.

211.    Walgreen breached the Amended and Restated Product Placement Agreement by failing to place 22 of the specified Premium Space Products on Saddle Fixtures in 2,000 stores. As Zeikos has learned through discovery in this action, Walgreen never had, during the term of the Amended and Restated Product Placement Agreement, any more than about 1,237 stores with Saddle Fixtures.

**ANSWER:**    Walgreens denied the allegations of Paragraph 211 because the allegations

are untrue, including based on the facts and evidence described above concerning Paragraphs 3,

82, 83.

212.    Walgreen breached the Amended and Restated Product Placement Agreement by failing to place each of the specified 22 Premium Space Products in each of the Saddle Fixtures that contained Zeikos products. As Zeikos has learned through discovery in this action, Walgreen never had, during the term of the Amended and Restated Product Placement Agreement, more than 16 of the 22 specified Exhibit A Premium Space Products in any of the Saddle Fixtures.

**ANSWER:**    Walgreens denied the allegations of Paragraph 212 because the allegations are untrue, including based on the facts and evidence described above concerning Paragraphs 3, 82, 83.

213.    Walgreen breached the Amended and Restated Product Placement Agreement by failing to place each of the 26 Premium Space Products listed in its Exhibit A in the 010 Fixtures in 3,000 stores and 22 of the specified Premium Space Products listed on its Exhibit A in the Saddle Fixture in 2,000 of its stores. As Zeikos has learned through discovery in this action, Walgreen's mylar label counts demonstrate that Walgreen did not have more than about 3,337 stores, during the term of the Amended and Restated Product Placement Agreement, that had either 26 Exhibit A products in the 010 Fixtures or the specified 22 Exhibit A products in the Saddle Fixtures.

**ANSWER:**    Walgreens denied the allegations of Paragraph 211 because the allegations are untrue, including based on the facts and evidence described above concerning Paragraphs 3, 82, 83.

222.    Walgreen's offer and Zeikos's acceptance of that offer resulted in the formation of the January 2021 Contract.

**ANSWER:**    Walgreens denied the allegations of Paragraph 222 because the email exchange relied upon did not result in a contract. There is no evidence that such a contract was formed, as the Court stated in its Memorandum Decision. *See* Dkt. 124 at 22 (The "Court is convinced that the threadbare January 2021 Contract cannot possibly be interpreted as a "complete and exclusive statement of the agreement's terms."). The exchange of emails in January 2021 instead constituted an exchange of proposals and counter-proposals.

**Topic 69. The factual and evidentiary basis for each affirmative defense Walgreen asserted in its answer, filed January 24, 2024.**

16

**ANSWER:** Walgreens alleges nine affirmative defenses, supported as follows by the facts and evidence identified below.

Walgreens first affirmative defense is "Prior Material Breach" by Zeikos. Concerning this defense, the Amended PPA is a legally enforceable contract made between Walgreens and Zeikos, the premise of which was that Zeikos would deliver Premium Products to Walgreens and Walgreens would reserve its Premium Space for those products at Walgreens stores. Likewise, while Walgreens disputes this, Zeikos also claims that the parties reached a similar agreement in 2021 (the "2021 Deal").

Zeikos breached the material terms of the Amended PPA and the alleged 2021 Deal by failing to deliver goods that had been ordered for placement and sale in the Premium Space, leaving Walgreens without product to sell from the Premium Space in its stores that had been exclusively reserved for Zeikos.

Additional facts and evidence supporting this defense are described above concerning Walgreens' answers to Paragraphs 3 and 4 of the Third Amended Complaint.

Walgreens' second affirmative defense is "Impossibility". This defense is based on the fact that Walgreens could not place or sell products that Zeikos did not and claims it could not deliver, rendering performance impossible. Additional facts and evidence supporting this defense are described above concerning Walgreens' answers to Paragraphs 3 and 4 of the Third Amended Complaint.

Walgreens' third affirmative defense is "Waiver" concerning Zeikos' first claim, concerning alleged fraud as to the initial PPA. That claim is that Zeikos entered the PPA in reliance on the supposed "Representation" to it by Albert Gehrke in May 2019 concerning prior-year sales of Infinitive products from the Premium Space, or else the "Omitted Fact" of what those sales had

been. While Walgreens denies that the Representation or Omitted Fact occurred, regardless of that Zeikos admits at Paragraph 71 of its Third Amended Complaint that accurate forecasts of projected sales of its products were provided to Zeikos on the SupplierNet system by which Walgreens and its vendors communicate. Those forecasts predicted sales lower than Zeikos' alleged expectations. Thereafter, Zeikos also experienced months of actual sales that were also lower than Zeikos' alleged expectations. *See* Saideh Tr. at 119-120. On February 7, 2020, Zeikos wrote to Walgreens claiming it had agreed to the PPA based on the supposed "verbal forecast" of $80 million in retain sales whereas then current forecasts were for $40 million. *Id.* at 124-27; *see also* Z017521. Thereafter, on February 21, 2020, Zeikos unilaterally terminated the PPA unilaterally based on the lower than expected sales numbers. *See id.* at 155-56; Z1092728. At that time, Zeikos contended it had been defrauded according to its own testimony and admissions. As Mr. Saideh testified, he stated at that time: "They did fraud to us, those motherfuckers." *Id.* at 203; *see also id.* at 183 (testifying that "we realize[d] in November, December [2019] that they lied to us and they trick me to a program").

Nonetheless, in April 2020, Zeikos agreed to the Amended PPA, which on its face states that it "amends, restates and supersedes in its entirety" the PPA. The Amended PPA reduced the total credits Zeikos would give Walgreens from $9 to $7 million and provided that the $5 million credit taken under the PPA would instead be applied to the Amended PPA, such that no payments or credits by Zeikos were allocated or applied to the PPA. As a result of Zeikos entering into the Amended PPA, which provided Zeikos with substantial benefits on the same subject matter as the PPA, and which superseded the PPA, Zeikos waived any right to claim that there had been fraudulent inducement of the PPA. It is a fact that Zeikos paid nothing to Walgreens for the PPA, which was superseded and rendered void by agreement of the parties.

Walgreens' fourth affirmative defense is "Waiver" as to Zeikos' second claim. Prior to entering the Amended PPA, Zeikos informed Walgreens that it believed its products were not being placed at sufficient number of Walgreens' stores or in the correct fixtures within the Premium Space. *See id.* at 143; *see also* Z005014. Zeikos was further aware of store counts of its product by store through continuous communication via SupplierNet. Zeikos nonetheless agreed to the Amended PPA. By entering into the Amended PPA while claiming knowledge of Walgreens' alleged breaches of its placement obligations, Zeikos waived the right to claim that Walgreens breached the Amended PPA prior to April 2020.

Walgreens' fifth affirmative defense is "Estoppel." Zeikos entered the Amended PPA with full knowledge of the supposed facts on which it bases its claims, as detailed above. It agreed that the Amended PPA "amends, restates and supersedes in its entirety" the PPA, and thereby reduced the total credits Zeikos would give Walgreens from $9 to $7 million and provided that the $5 million credit taken under the PPA would instead be applied to the Amended PPA. Despite thus knowing the bases of its purported claims, and even having terminated the PPA, Zeikos chose to re-negotiate and enter into new contracts with Walgreens, including the Amended PPA and the 2021 Deal, repeatedly telling Walgreens that it considered Walgreens a partner and looked forward to working with Walgreens based on some new arrangement. *See* Saideh Tr. at 177-78; *see also* Z010994. By entering into a new agreement that superseded the PPA, and later the 2021 Deal, notwithstanding its alleged knowledge regarding supposed misrepresentations and supposed breaches by Walgreens, and despite telling Walgreens that it considered Walgreens a valued business partner, Zeikos intentionally concealed that it intended to seek damages for those supposed breaches and misrepresentations. Zeikos either intended or expected Walgreens to act in reliance upon its failure to inform it of the supposed breaches or misrepresentations that Zeikos

now alleges. Walgreens did act based upon Zeikos' failure to inform it of the supposed breaches or misrepresentations by continuing with negotiations, repeating Zeikos' desire to partner and work with Walgreens, and ultimately entering into the Amended PPA and the 2021 Deal. Because Zeikos failed to bring claims against Walgreens under the PPA when it had a right to do so, and after it supposedly learned of the breaches and misrepresentations, and instead opted to renegotiate the parties' agreement, lulling Walgreens into doing so by stating that it considered Walgreens a valued partner with whom it looked forward to working, Zeikos is estopped from asserting any such right relating to those supposed breaches and misrepresentations.

Walgreens' sixth affirmative defense is "Novation." Based on the facts and evidence already described above, Zeikos' decision to enter the Amended PPA, which explicitly stated that it "amends, restates and supersedes in its entirety" the PPA, extinguished the parties' obligations under the PPA entirely and Zeikos cannot bring any claims relating to the PPA pursuant to the doctrine of novation.

Walgreens' Seventh Affirmative Defense is "Accord and Satisfaction." This defense is based on the same facts and evidence already outlined. There was a genuine dispute between the parties about the PPA and its terms, with claims of damages made by both Walgreens and Zeikos. Both Walgreens and Zeikos took the position that an unliquidated amount was owed by the other. In response to this dispute, there was a shared, mutual intent to compromise the claims and Walgreens and Zeikos negotiated a new agreement, the Amended PPA which was entered into in April 2020. The Amended PPA is a valid agreement for which consideration was provided. Because the parties shared an intent to compromise all claims under the PPA, Zeikos cannot bring any claims relating to the PPA pursuant to the doctrine of accord and satisfaction.

Walgreens' eighth affirmative defense is "Set-Off." Walgreens suffered damages from lost sales as a result of Zeikos' failure to deliver the products that Walgreens did order for the Premium Space. Facts and evidence that show Zeikos' failure is identified above in the answers concerning Walgreens' answers to Paragraphs 3-4 and 82-83 of the Third Amended Complaint and below concerning various paragraphs of Walgreens' Counterclaim as requested by Topic 70. Any damages Zeikos alleges are properly set off by the damages Walgreens incurred as a result of Zeikos' own breach.

Walgreens ninth affirmative defense is "Failure to Mitigate Damages." To the extent Zeikos seeks damages for goods that were not sold, it failed to mitigate damages because it did not take action to sell those goods to other sources. Walgreens has sought evidence of such mitigation from Zeikos but Zeikos has been unable to provide it.

**Topic 70. The factual and evidentiary basis for Walgreen's allegations in paragraphs numbered 41, 45, 46, 48, 49, 52, and 56 of its counterclaims.**

41.    The accepted purchase orders by which Walgreens ordered and Zeikos agreed to supply specific quantities of specific products on a specific schedule (the "Purchase Orders") were contracts between Walgreens and Zeikos for the purchase and sale of goods.

**ANSWER:** There are over 1,000 Purchase Orders referred to in Paragraph 41 of Walgreens' Counterclaim for which Zeikos did not deliver the products for the Premium Space that Walgreens ordered. *See* WAG13331.

45.    Zeikos breached its obligations pursuant to the Purchase Orders by failing to deliver the quantities it promised to deliver.

**ANSWER:**    Facts and evidence supporting the allegations of Paragraph 45 of Walgreens' counterclaim are identified above concerning Walgreens' answer to Paragraph 141 of the Third Amended Complaint.

46.    As a direct, proximate and foreseeable result of Zeikos' breaches of the Purchase Orders, Walgreens lost sales and profits it would otherwise have earned by resale of

Zeikos' products. The amount of Walgreens' consequent damages is in the millions, if not the tens of millions of dollars.

**ANSWER:** The Terms of the PPA, Amended PPA and January 2021 Deal provided Zeikos with exclusivity to areas of the Premium Space. The Premium Space was among the most valuable space in Walgreens' stores and were near the counter where customers check out. When Zeikos could not deliver the required number of products ordered by Walgreens, pursuant to individual purchase orders, Walgreens did not have products to sell from the Premium Space it had promised by contract to Zeikos. Throughout the life of the Premium Space agreements, Zeikos failed to deliver Premium Space goods consistent with more than 1,000 Purchase Orders it accepted from Walgreens. WAG13331. OTFR charges are further evidence of Zeikos' failure to deliver. *See* WAG13472.

Between November 2019 and August 2021, Walgreens sold at least 5,051,178 Premium Space goods for $72,026,916. WAG14522. Walgreen's profit on those goods was $47,345,600. *Id*. Zeikos failed to deliver at least hundreds of thousands of units of Premium Space goods (WAG13331), and Walgreens' anticipated profit on those goods, based on its profit from the goods it did sell, was in the millions, if not tens of millions. Walgreens intends to rely on expert testimony to further support its damages and will disclose its expert's opinions as required by the Court.

48. Walgreens and Zeikos contracted by the GTA that Walgreens would be refunded for the amounts Walgreens paid for any goods deemed unsaleable by Walgreens, in its sole discretion.

**ANSWER:** A copy of the executed GTA was produced at WAG13224. The GTA states in its preamble that: "The terms and conditions contained herein shall apply to all merchandise . . . sold by [Zeikos], directly or indirectly through its distributors, to Walgreen[s]." The GTA further provides that: "[Zeikos'] performance shall be in accordance with these terms, dating and

conditions. Any other terms in [Zeikos'] acceptance are rejected unless agreed to in writing and signed by Walgreen's authorized representative." Additionally, the GTA states "[Zeikos] is subject to all policies, procedures, terms and conditions as posted on Walgreen's SupplierNet website located at https://vendor.walgreens.com and all such policies, terms and conditions, as updated from time to time, are hereby incorporated herein and made a part hereof."

One policy listed on SupplierNet, and incorporated into the GTA, is the Unsaleables Policy. The Unsaleables Policy provides that Walgreens "requires its vendors to bear the risk of merchandise in Walgreens' possession that is deemed by Walgreens, in its sole discretion, to be unsaleable." Unsaleable goods include outdated or defective goods along with goods returned by customers. For goods that are deemed "unsaleable," "unless otherwise agreed," the "merchandise is reported to the District Manager and then disposed of." These unsaleable claims are then "charged against [Zeikos] on a monthly basis." A copy of the unsaleable policy was produced at WAG13202.

49.     Walgreens and Zeikos also contracted that Walgreens could seek any amounts owing after an audit, for up to two and a half years.

**ANSWER:**     A copy of the executed GTA was produced at WAG13224. The GTA states in its preamble that: "The terms and conditions contained herein shall apply to all merchandise . . . sold by [Zeikos], directly or indirectly through its distributors, to Walgreen[s]." The GTA further provides that: "[Zeikos'] performance shall be in accordance with these terms, dating and conditions. Any other terms in [Zeikos'] acceptance are rejected unless agreed to in writing and signed by Walgreen's authorized representative." The GTA also expressly incorporates Walgreens' Post Audit Policy. The Post Audit Policy provides that "Walgreens reserves the right to audit all transactions up to two and one-half years from the end of the calendar year that the transaction occurred." A copy of the post audit policy was produced at WAG13453.

52. Zeikos, however, breached the terms of the parties' agreements, including by: a. Failing to refund Walgreens for the 238 units of unsaleable Electronic Accessories; and b. Failing to make payment following the audit performed by Walgreens after these transactions and failing to reimburse Walgreens for billing discrepancies.

**ANSWER:** The amounts due to Walgreens, along with one credit, are included on the open activity report produced at WAG13402. Documents establishing the amounts owed on the open activity report were produced at WAG13347, WAG13348, WAG13349, WAG13362, WAG13406, WAG13201, WAG13239, WAG15039.

56. Zeikos was further unjustly enriched by refusing to make payment for amounts owed to Walgreens as found in Walgreens' audit.

**ANSWER:** Walgreens refers for the evidence in support of this allegation to its response concerning the facts and evidence that support Paragraph 52 of its counterclaim herein.

**Topic 80. The factual and evidentiary basis for any allegation or contention of Walgreen that Walgreen would have sold to its customers any or all of the products that Zeikos did not deliver in response to a Walgreen purchase order.**

**ANSWER:** Walgreens consistently sold out of many of the Premium Space products that Zeikos did deliver to Walgreens. Walgreens repeatedly published the store counts, along with the store outs (the number of stores without a particular product) on SupplierNet. The reason Walgreens' stores were missing product was because Zeikos was not delivering requested product. Walgreens would have sold the product that Zeikos could not deliver because it was selling the product that Zeikos did deliver. As Jack Saideh conceded at his deposition, Walgreens could not sell what Zeikos did not deliver. Saideh Tr. at 118-19.

Dated: August 30, 2024

                              **WALGREEN CO.**

                              By:    /s/ Robert M. Andalman
                                     One of its Attorneys

Robert M. Andalman (ARDC No. 6209454)
Rachael Blackburn (ARDC No. 6277142)
**A&G LAW LLC**
542 South Dearborn, 10th Floor
Chicago, IL 60605
Telephone: (312) 348-7629
Facsimile: (312) 341-0700