UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ZEIKOS, INC., | ) ) ) | |
| *Plaintiff*, | ) ) | No. 23 C 303 |
| v. | ) ) | Chief Judge Virginia M. Kendall |
| WALGREEN, CO., | ) ) | |
| *Defendant*. | ) ) ) | |

### REDACTED MEMORANDUM OPINION AND ORDER

This case arises from a series of contract-related disputes between Plaintiff Zeikos, Inc. ("Zeikos"), an importer-distributor of electronic accessories, and Defendant Walgreen, Co. ("Walgreen"), a subsidiary of the retail pharmacy company Walgreens Boots Alliance, Inc. ("WBA"). Pending before the Court is Zeikos's Motion for Partial Summary Judgement on Walgreen's liability for Zeikos's second breach of contract claim (Count II) and Zeikos's liability for Walgreen's first breach of contract counterclaim (Count I). (Dkt. 178). Also pending before the Court is Walgreen's Motion to Strike the declaration of William Dunnegan. (Dkt. 217). For the reasons below, the Court denies Zeikos's Motion for Partial Summary Judgment [178] and grants Walgreen's Motion to Strike [217].

### BACKGROUND

In Zeikos's second claim for breach of contract, Zeikos alleges that Walgreen breached the Amended and Restated Purchase and Placement Agreement ("APPA") by failing to place certain Zeikos products—referred to as "Premium Space Products"—in the agreed-upon locations within the "Premium Space" at a designated number of Walgreen's stores. (Third Am. Compl., Dkt. 105

1

¶¶ 202–17).[1] In Walgreen's counterclaim for breach of contract (Count I), Walgreen asserts that Zeikos breached purchase orders ("the Purchase Orders") by failing to deliver the promised quantities of goods. (Dkt. 135 ¶¶ 40–46). The purpose of at least some of the Purchase Orders was for Walgreen to acquire Zeikos products to place in the Premium Space at its stores in performance of its obligations under the APPA. (Dkt. 138 ¶ 41–43).

I.     The APPA

The APPA was effective from April 2020 to December 2020. (Dkt. 105-3 at 2).[2] The APPA obligated Walgreen to place the Zeikos "merchandise listed on Exhibit A" in "the Premium Space" at 5,000 of Walgreen's stores. (Dkt. 105-3 at 2). The "Premium Space," also referred to as the "impulse queue," is the area near the registers at the front of Walgreen stores where customers line up and check out. (Dkt. 214-4 ¶ 15). In performing the obligation to place Zeikos's Premium Space Products in 5,000 of its stores, the APPA required Walgreen to place the listed products on a "010 fixture" in 3,000 of its stores. (Dkt. 105-3 at 2, 4). An "010 fixture" is "a four (4) shelf fixture at the front of the store that sits at the beginning of the registers." (*Id.* at 2). The APPA further required Walgreen to place the listed products on a "saddle fixture" in 2,000 of its stores. (*Id.*) A "saddle fixture" is "an acrylic tray that sits on the half shelf in the checkout queue." (*Id.*) And if Walgreen changed the 010 Fixtures and Saddle Fixtures or moved them to other areas of Walgreen's stores, the APPA required Walgreen to use "best efforts to provide [Zeikos's products]

---

[1] Zeikos previously waived its alternative theory that Walgreen breached the APPA by failing to properly display the Premium Space Products once they were placed in the Premium Spaces. (Dkt. 125 at 19).

[2] The APPA states that the "Restatement Effective Date" was April 1, 2020, and the term of the agreement ran until December 31, 2020. (Dkt. 105-3 at 2). The parties, however, dispute the exact day on which the APPA became effective, and both parties had not signed the agreement until April 22, 2020. (Dkt. 105-3 at 3; Dkt. 230 ¶ 10).

similar placement during the remainder of the then-current Term with similar amount of customer traffic as the 010 fixture and/or saddle fixture, as applicable." (*Id.* at 2).

Exhibit A of the APPA uses a table to specify the Zeikos products the APPA obligated Walgreen to place. (Dkt. 105-3 at 4). All twenty-six Zeikos products are listed on their own row under a column labeled "010 Fixture." (*Id.*) Under the 010 Fixture column, each of the twenty-six Zeikos products are placed under one of four sub-columns labeled as one of the 010 Fixture's four shelves ("Shelf 1," "Shelf 2," etc.) (*Id.*) Under an adjacent column labeled "Saddle Fixture," there is a cell for each of the twenty-six Zeikos products that is either marked with an "x" or left blank; twenty-two of the twenty-six cells are marked with an "x." (*Id.*) The parties agree that the "x" meant that a particular product was designated for placement in the Saddle Fixture (Dkt. 179 ¶ 9; Dkt. 216 ¶ 18). The parties dispute, however, whether all of the twenty-two products marked with an "x" had to be place on a saddle fixture at 2,000 stores. (Dkt. 178 at 3–4; Dkt. 212 at 9; Dkt. 214 ¶ 9; Dkt. 230 ¶ 18). Under the Saddle Fixture column, the products are not assigned to a particular shelf or other location within the fixture, as they are under the 010 Fixture Column. (Dkt. 105-3 at 4). Additionally, a separate column specifies the number of "facings" for each product. (Dkt. 105-3 at 4). A "facing" is a single placement of a product in a fixture. (Dkt. 214-22 ¶ 20). The parties agree that during the term of the APPA, Walgreen never placed more than 16 Premium Space Products in a saddle fixture. (Dkt. 216 ¶ 18; Dkt. 230 ¶ 18).

## II. Zeikos's Ability to Deliver Products

The parties dispute whether Zeikos was able to efficiently fill Walgreen's purchase orders. Denise Suhajda, who was Walgreen's inventory manager for the electronic products that Walgreen purchased from Zeikos between 2019 and 2021, states that Zeikos "repeatedly failed" to fill Walgreen's purchase orders. (Dkt. 214-4 ¶ 11). In June 2020, Walgreen determined that during

Fiscal Year 2020, Zeikos delivered 61% of what Walgreen ordered, and Walgreen typically expects a 95% fulfillment rate from its vendors in order to maintain inventory. (Dkt. 214-4 ¶¶ 17, 21). In December 2020, "Zeikos'[s] failure to deliver resulted in one product being out of stock in 2,100 stores and another in more than 500 stores." (Dkt. 214-4 ¶ 15). Also in December 2020, eighteen Zeikos Premium Space Products were out of stock in more than 100 stores due to Zeikos's inability to fill purchase orders. (Dkt. 214-4 ¶ 15). Throughout the lifespan of Walgreen's Premium Space arrangement with Zeikos, Zeikos supplied approximately 80% of what Walgreen ordered. (Dkt. 214-4 ¶ 21).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Med. Protective Co. of Fort Wayne v. Am. Int'l Specialty Lines Ins. Co.*, 990 F.3d 1003, 1008 (7th Cir. 2021). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "A genuine issue of material fact exists only if 'there is sufficient evidence' " for a reasonable jury to return a verdict for the nonmoving party. *BirchRea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. "Speculation is not sufficient to survive summary judgment; there must be evidence." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (cleaned up and internal citations omitted). And where "a plaintiff moves for judgment as a matter of law on an entire claim, he implicitly contends there is no genuine dispute about any fact material to the defendant's

4

affirmative defenses[,] such that "a dispute over a fact material to an affirmative defense precludes summary judgment." *Frerck v. Pearson Educ., Inc.*, 63 F. Supp. 3d 882, 886 (N.D. Ill. 2014).

## DISCUSSION

### I. Motion to Strike

Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Personal knowledge within the meaning of these rules includes, it is true, inferences from sense data as well as the sense data themselves[.]" *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989). Walgreen moves to strike the Declaration of Zeikos counsel William Dunnegan, (Dkt. 179-6), on the grounds that he lacks personal knowledge of the Walgreen documents he discusses in the declaration. (Dkt. 217; Dkt. 218 at 1). Dunnegan's declaration details his analysis of Walgreen documents concerning inventory of Zeikos products, planograms, sales, and mylar labels that Walgreen produced in discovery. (*See generally* Dkt. 179-6).

While Dunnegan asserts that he made the declaration based on his "personal knowledge concerning the events in this litigation," the Walgreen documents that his declaration rests on are not "events in this litigation." (Dkt. 179-6 ¶ 2). They are records detailing the inner workings of Walgreen's business. Dunnegan's declaration is not "first-hand evidence" of Walgreen's business operations or the documents describing them. *Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015); *Nw. Nat. Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994) ("The lawyer does not claim to have any personal knowledge of the events in 1981 and 1984. Instead the affidavit was just a cover page for a sheaf of documents six inches thick, which the lawyer asked the district court to review."). Because Dunnegan lacks personal knowledge of these documents, he also could

5

not authenticate them at trial. Because these documents are business records, a custodian or other qualified witness is required under Rule 803(6), and the "fact of production in the litigation says nothing about [Dunnegan's] familiarity with [Walgreen's] record-keeping practices." *Castro v. DeVry Univ.*, Inc., 786 F.3d 559, 578 (7th Cir. 2015) ("The mere act of producing a document in response to a discovery request based on the content of the document does not amount to an admission of the document's authenticity.").

Because Dunnegan lacks the personal knowledge required to authenticate the documents, the exhibits attached to Dunnegan's declaration, then, would not be admissible as summaries under Fed. R. Evid. 1006, because admission of the summaries would require the proponent, Dunnegan, to lay a proper foundation for the admission of the summarized documents and show that the summaries are accurate. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). Accordingly, the Court grants Walgreen's Motion to Strike. (Dkt. 217). The Court strikes Dunnegan's declaration and the attached exhibits, save the attached deposition testimony and the few paragraphs in the declaration that detail Dunnegan's communications with opposing counsel. (*E.g.*, Dkt. 179-6 ¶¶ 26–27).

## II. Motion for Partial Summary Judgment

Now the Court turns to Zeikos's Motion for Partial Summary Judgement on Zeikos's claim for breach of the APPA (Count II) and Walgreen's counterclaim for breach of purchase orders (Count I). (Dkt. 178). The Court addresses Zeikos's claim and Walgreen's counterclaim in turn.

### a. Zeikos's Claim for Breach of the APPA (Count II)

First, Zeikos moves for summary judgment on its claim for breach of the APPA (Count II). Under Illinois law, the elements of a breach of contract claim are "(1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and

(4) damages caused by that breach." *Ivey v. Transunion Rental Screening Sols.*, Inc., 215 N.E.3d 871, 877 (Ill. 2022).

As noted above, the parties agree that during the term of the APPA, Walgreen never placed more than sixteen Premium Space Products in a saddle fixture. (Dkt. 230 ¶ 18). So, the question of whether Walgreen breached the APPA as a matter of law turns on whether the agreement required Walgreen to place all twenty-two of the products listed in Exhibit A's Saddle Fixture category on a saddle fixture in 2,000 of its stores. Because Walgreen raises significant factual disputes regarding its affirmative defense of impossibility, however, the Court declines to resolve the breach issue today.

In its affirmative defense of impossibility, Walgreen argues that because Zeikos "did not and could not deliver sufficient product for placement in the Premium Space according to what it alleged were the terms of the Amended PPA," Zeikos rendered performance impossible. (Dkt. 135 at 72–73); *see Shea v. Angulo*, 1994 WL 188205, at *8 (N.D. Ill. May 12, 1994) ("The existence of these issues of material fact preclude entry of summary judgment in [plaintiff's] favor with respect to [defendant's] Fifth Affirmative Defense, impossibility of performance."); *55 Jackson Acquisition, LLC v. Roti Restaurants, LLC*, 202 N.E.3d 998, 1009 (Ill. App. Ct. 2022) (discussing impossibility and commercial frustration); *Leonard v. Autocar Sales & Serv. Co.*, 64 N.E.2d 477, 479–80 (Ill. 1945) ("The doctrine of frustration is an extension of this exception to cases where the cessation or nonexistence of some particular condition or state of things has rendered performance impossible and the object of the contract frustrated. It rests on the view that where from the nature of the contract and the surrounding circumstances the parties when entering into the contract must have known that it could not be [per]formed unless some particular condition or state of things would continue to exist, the parties must be deemed, when entering into the contract,

to have made their bargain on the footing that such particular condition or state of things would continue to exist, and the contract therefore must be construed as subject to an implied condition that the parties shall be excused in case performance becomes impossible from such condition or state of things ceasing to exist.").

Zeikos's response is twofold: (1) given Walgreen's planograms for the saddle fixtures, Walgreen never intended to place the products as the APPA required; and (2) Walgreen had a surplus supply of Zeikos Premium Space Products, such that performance was possible irrespective of Zeikos's failure to deliver certain goods. (Dkt. 138 at 11–12). First, it is a stretch to suggest that Walgreen intended to breach the contract based on the planograms alone. And more so, to the extent Zeikos's response to the impossibility defense will turn on an allegation of bad faith, summary judgment is "notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006) (quoting *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976)). Second, Zeikos fails to offer any evidence to rebut Walgreen's significant evidence that during the duration of the APPA, Zeikos's failure to deliver purchased products resulted in Walgreen's stores being out of stock of Premium Space Products. (Dkt. 214-4 ¶ ¶ 11, 14–15, 17, 21). This "dispute over a fact material to an affirmative defense"—whether Zeikos's challenges fulfilling purchase orders made it impossible for Walgreen to place Zeikos products in conformity with the APPA—precludes summary judgment. *Frerck*, 63 F. Supp. at 886. Accordingly, summary judgment is inappropriate on Zeikos's Count II.

### b. Walgreen's Counterclaim for Breach of Purchase Orders (Count I)

In its counterclaim for breach of the Purchase Orders (Count I), Walgreen asserts that Zeikos breached accepted the Purchase Orders, which were contracts for the purchase and sale of goods. (Dkt. 135 at 85, ¶¶ 40–46). Zeikos argues that Walgreen did not lose any sales or profits as

a result of the alleged breach of the Purchase Orders, because, as Zeikos also asserted above, Walgreen had more inventory of Premium Space Products than it could sell. (Dkt 178 at 12). Zeikos further contends that there is no genuine dispute over the fact that such a surplus of inventory. (*Id.*)

Walgreen, however, does genuinely dispute whether it had surplus inventory of Zeikos's Premium Space Products. (Dkt. 214 ¶ 31–32; Dkt. 211 at 13–14). Zeikos bases its allegation that Walgreen held surplus inventory solely on data Walgreen provided in discovery. (Dkt. 179 ¶ 31–32, 36–37). Walgreen, however, has since made clear that the data on which Zeikos relies was entirely faulty due to a data pull error. (Dkt. 212 at 14; Dkt. 214 ¶¶ 31–32). Zeikos also acknowledges that for two months, Walgreen did not have a surplus inventory of two of Zeikos's Premium Space Products. (Dkt. 178 at 13–14). Walgreen further offers evidence that Zeikos's failure to fill purchase orders resulted in stores without any inventory of Zeikos products. (Dkt. 214-4 ¶¶ 11, 15).

In a final effort on the issue, Zeikos attaches the newly discovered documents to its reply, without providing any analysis of their contents and merely asserts that they show beyond any genuine dispute that Walgreen had excess inventory. (Dkt. 228 at 14). But even assuming Zeikos could authenticate these Walgreen documents, "[d]istrict judges are not archaeologists." *Nw. Nat. Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994). And without contextual information detailing sales rates and how Walgreen used its inventory, documents detailing raw inventory numbers alone fail to foreclose the genuine factual dispute over whether Walgreen had a surplus of Zeikos's Premium Space Products. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

Accordingly, the Court denies Zeikos's Motion for Partial Summary Judgement as it relates to Walgreen's first counterclaim.

## CONCLUSION

For the reasons below, the Court denies Zeikos's Motion for Partial Summary Judgment [178] and grants Walgreen's Motion to Strike [217].

Virginia M. Kendall
United States District Judge

Date: May 6, 2025